FRANCES GRIER, ADMINISTRATRIX OF THE ESTATE OF MISSOURI GILMORE, DECEASED, v. RENA C. PHILLIPS.

(Filed 12 October, 1949.)

**1. Trial § 22a—**

On motion to nonsuit, the evidence will be considered in the light most favorable to plaintiff, and plaintiff is entitled to every reasonable intendment thereon and every reasonable inference therefrom.　G.S. 1-183.

**2. Physicians and Surgeons § 20—**

In an action for malpractice, the burden is upon plaintiff to show not only negligence but that such negligence was the proximate cause or one of the proximate causes of the injury or death.

**3. Trial § 23a—**

Evidence which raises a mere surmise or conjecture as to the existence of a fact essential to the cause of action is insufficient to be submitted to the jury.

**4. Physicians and Surgeons § 14—**

In an action for malpractice, the fact that defendant practiced dentistry without a license is immaterial upon the question of due care.　G.S. 90-29, G.S. 90-40.

**5. Physicians and Surgeons § 15—**

A person practicing dentistry without a license is required to exercise the care and skill of a licensed dentist.

**6. Physicians and Surgeons § 14—**

Dentists, in their particular fields, are subject to the same rules of liability as physicians and surgeons.

**7. Physicians and Surgeons § 20—**

Plaintiff's evidence was to the effect that her intestate went to the office of a licensed dentist, that the dentist was out and that the dentist's wife, who had no license, extracted three of intestate's teeth, that thereafter intestate's gums became swollen and inflamed and that intestate died some ten days later of advanced nephritis.　*Held:* There was no sufficient evidence to be submitted to the jury of negligence in the way or manner in which the teeth were extracted.

**8. Same—Evidence held insufficient to show causal connection between extraction of teeth and death of intestate.**

Plaintiff's evidence tended to show that her intestate went to the office of a licensed dentist, that he was out, and that the dentist's wife, the

defendant, who had no license, extracted three of intestate's teeth, and that intestate died some ten days thereafter of advanced nephritis. There was evidence that there is danger in pulling teeth in the presence of Vincent's disease and that intestate had this disease some four days after the extraction, but plaintiff's expert testimony raised only a surmise as to whether intestate had this disease at the time of the extraction. *Held:* Defendant's motion to nonsuit was properly allowed.

APPEAL by plaintiff from *Morris, J.*, at May Term, 1949, of WILSON.

Civil action to recover (1) for alleged wrongful death, and (2) for pain and suffering sustained by intestate of plaintiff between date of the alleged wrong, and date of her death.

Plaintiff alleges in her complaint as a first cause of action:

That on morning of 18 August, 1947, her intestate went to the house and office of Dr. W. H. Phillips, a dentist duly licensed and practicing his profession, in Wilson, North Carolina, for the purpose of having a tooth extracted; that Dr. Phillips was not there, but his wife, the defendant, who is not a dentist, nor trained and educated in dental science, licensed and qualified to practice dentistry in the State of North Carolina, or elsewhere, was in his office; that at invitation and request of defendant intestate occupied the dentist's chair in the office for the purpose of allowing defendant to pull her tooth; that intestate did not then know what defendant was about to do, and was ignorant of the danger, and trusted defendant to do her no harm; that while intestate was in said dentist's chair, defendant wrongfully, willfully, and negligently proceeded to pull all the teeth of intestate, notwithstanding the fact that the condition of her mouth, gums and general physical condition at the time showed that such an act was hazardous to her life and well-being; that defendant, in pulling the said teeth, willfully violated her duty to intestate and was negligent in that the proper methods and safeguards for the health, protection, and well-being of intestate were not used; that defendant knew or should have known (1) that she was not qualified or competent to act as a dentist, and (2) that the pulling of the teeth of intestate would be dangerous to intestate's life; and that immediately after her teeth were pulled, and as a result thereof the intestate became seriously ill and died 28 August, 1947, of an infection proximately caused by and resulting from the said wrongful conduct of defendant to the great damage of plaintiff.

And for a second cause of action, plaintiff reiterates the allegations of the first cause of action, and alleges that on 18 August, 1947, immediately after defendant had pulled the teeth of intestate, she became seriously ill and all during the ten days of her illness immediately preceding her death, she suffered intense and severe physical pain resulting from and proximately caused by defendant's wrongful conduct, to her damage, etc.

22—230

Defendant, answering the allegations of the complaint, admits (1) that she is not a dentist and is not licensed to practice dentistry in the State of North Carolina or elsewhere; and (2) that on or about 18 August, 1947, plaintiff's intestate came to the office of Dr. W. H. Phillips for the purpose of having three teeth pulled; that defendant at request of plaintiff's intestate caused her to be seated in a dental chair and she, the defendant, examined the mouth and teeth of the plaintiff's intestate, and found that the three teeth remaining in the intestate's mouth were loose and easy of extraction, and were of no service to intestate; and that defendant complied with the request and importunity of intestate and pulled the said three teeth. Defendant denied in material aspect other allegations of the two causes of action set forth in the complaint.

Plaintiff offered on the trial in Superior Court the above admissions of defendant and the testimony of six witnesses, which may be summarized as follows:

(1) L. W. Morris, of Wilson, North Carolina, by whom Missouri Gilmore, plaintiff's intestate, had been employed for twenty years, testified: That after an absence of a few weeks she came to him Monday morning, 18 August, 1947, to get $3.00 to have three teeth pulled; that at that time "she was thinner and weaker" than he had ever seen her; that about an hour later she came back for $2.00,—saying it would take that much more; that she told him she had only three teeth, and, as he thinks, they were located in the front upper gums; that he next saw her Tuesday night; that at that time she couldn't eat anything, her gums were so sore; that he next saw her in her room on Thursday; and that she could not speak, but he observed nothing to indicate she was suffering pain.

(2) Julia Barefoot, at whose home Missouri Gilmore had had a room for three years, testified: That on the morning Missouri Gilmore had her teeth pulled, she, the witness, saw her going and waved her hand to her, but she had her hand over her mouth and said nothing; that, after her teeth were pulled, she saw her at home the same day; that she was sick; that her mouth looked raw "where they had pulled out her teeth"; that she didn't look right,—looked like she was going crazy—describing her actions; that she did not go to bed all night,—but sat on a trunk by her door in her room,—and was in pain—groaning; that she stayed in bed the third night; that other than her mouth being swollen witness noticed nothing unusual about her; and that while she said she was 63 years old, "she was a heap older than me, and I am 65."

(3) Frances Grier, administratrix of the estate of Missouri Gilmore, plaintiff in the action, testified: That Missouri Gilmore was her great-aunt; that she, the witness, lives in Raleigh; that when she saw her aunt

on the 26th of August, she smelled an odor at her mouth when close to her; that on the morning of 27th she was weak and could not eat or drink anything; that she, the witness, called Dr. Barnes, and saw him examine her mouth; that "both gums, up and down, looked like it had been plowed up," —her gums were "like dark blood," and bad odors came from her mouth; that her aunt had eight or nine old snags,—three solid teeth,—the rest kind of snags.

(4) Dr. Boise Barnes, a medical expert, testified: "I knew Missouri Gilmore . . . I had occasion to see her in August 1947. The first time I saw her was on August 22nd, at her room where she was living . . . she was in what we call a semicose condition . . . unable to speak . . . just looking off in space . . . I just looked in the mouth and the gums were swollen and the mouth inflamed and the odor was of the character of a Vincent's infection, that is, the same as trench mouth . . . I felt that she should be put in a hospital since she could not take anything by mouth. The next day when I called I was unable to see her as the front door of the house was locked and I didn't see her until 2 or 3 days . . . I went again through the back and saw her then. She was in a weaker condition. Her mouth was generally inflamed. I suggested that they put her in the hospital. I think that was the 27th and she was brought to the hospital. I didn't notice that she was in pain. She didn't react, didn't respond. I had to use a spoon to get her mouth open and she did not respond at that time, did not make any sound. She was unable to take anything by mouth. She was in a general toxic condition of the body. Also, the gums could have interfered as her inability to take nourishment caused the body perhaps to fail to eliminate certain poisons the body accumulated. I found infection. The gums were swollen, and were red, and there were some patches there, white patches, suggestive as the odor was too, of Vincent's disease and I made that diagnosis . . . I later confirmed that I was right in the first place. I would say that I saw the usual amount of infection. From my observation and treatment of her on August 22nd, I have no opinion satisfactory to myself as to whether or not that infection was present on August 18, 1947. As to that, I am unable to say. I have no opinion satisfactory to myself whether it is characteristic of Vincent's disease to develop and become present to the infection stage in 4 days' time . . . In my opinion, the cause of her death was a chronic condition of the kidneys, uremia, and that with Vincent's infection would be my diagnosis. I signed the death certificate reading 'Death due to Adv. nephritis—Vincent infection of throat and gums.' "

The doctor continued on cross-examination: "When I said that I found her in a semicose condition that means she was unconscious which might have been from the kidneys or any other cause. That condition is

symptomatic of uremia. The diagnosis I gave was the immediate cause of death. The urethra failure, failure of the function of the kidneys is the cause of uremia. I also stated that the uremia was induced by chronic nephritis, inflammation of the kidneys, that is a pre-existing or recurring of nephritis, this disease of the kidneys. This uremia was induced by a condition of the kidneys for some time and grew worse . . . I said I had no opinion as to whether or not she would have died as quickly whether her teeth were extracted or not." Then, on re-direct examination, Dr. Barnes said: "I am stating that the condition of her kidneys accelerated her death." Then on re-cross-examination, he continued: "She was an old woman and in a weakened condition . . . She had snags in her head a number of years, as Frances said. Usually it is a common condition of infection when there are broken-off teeth. It can affect one's health adversely."

(A copy of the death certificate was introduced only to be considered as corroborative evidence, "tending to bear out the witness Barnes" and not as substantive evidence.)

(5) Dr. E. A. Rasberry, a qualified medical expert, testified in pertinent part: "I am familiar with the disease known as Vincent's. It is commonly known as .trench mouth caused by two organisms working together which seem to harbor in the mouth. . . . When a smear from trench mouth is spread on a slide, you can see two distinct organisms. . . . I heard Dr. Barnes testify this morning. Vincent's disease is known as a chronic disease. . . . Assuming it to be true and that the jury finds by the greater weight of the evidence that the condition in plaintiff's intestate's mouth were as testified to by Dr. Barnes on August 22nd, when he first saw her, I have an opinion satisfactory to myself as to whether or not the plaintiff's intestate had Vincent's disease on August 18, 1947. My opinion is that there was Vincent's disease four days previous."

And on cross-examination the doctor in summary testified: "When I gave to the court and the jury my sworn opinion that she had trench mouth on August 18, it was because I thought Dr. Barnes had said she had general infection, ulcerations and white caps, and called it trench mouth . . . I have told you that there are one, two and three things necessary to diagnose it as Vincent's disease; general mouth infection, ulcers in the mouth, white caps in the ulcers; and if Dr. Barnes observed those three things, I am of the opinion that the plaintiff's intestate had it four days before. If from Dr. Barnes' testimony, it was found that she had only general infection and ulcers, she could have had some other infection."

Then, in answer to this question: "If he (Dr. Barnes) found only two-infection and the ulcers, are you now willing to swear that if he found those two things on the 22nd of August, are you willing to swear she had

Vincent's disease on the 18th?", the doctor answered: "No, I am not. Even if Dr. Barnes testified all three conditions existed, I would not make a diagnosis without a smear."

This witness, Dr. Rasberry, also testified that: "Nephritis is defined as an infection of the kidneys . . . We call it inflammation of the kidney . . . it is a condition which has an infection at the root of the trouble of the throat, of the ear, or scarlet fever, all that affects the kidneys. In my opinion there is danger in pulling teeth in the presence of any infection in the mouth. Assuming it to be true and the jury should find by the greater weight of the evidence that the plaintiff's intestate had nephritis at the time she had her teeth extracted by the defendant and if the jury should find that she then had Vincent's disease, in my opinion if this woman had chronic nephritis with Vincent's disease and if she had her teeth pulled, it would have a deleterious effect on her condition. By deleterious effect on the patient, I mean if she had Vincent's disease it would be hazardous. She would have less chance. Her general condition would be affected adversely. Assuming it to be true and that the jury should find by the greater weight of the evidence that the plaintiff's intestate had an advanced case of nephritis on the 22nd day of August, 1947, as testified to by Dr. Barnes, in my opinion the plaintiff's intestate would have had nephritis four days previously, on August 18, 1947."

(6) Dr. Dewey Boseman, a dental expert, testified: "A course of dental education includes the course of oral pathology. That is the science that treats of the diseases of the mouth· or adjoining tissues. It includes the recognition, diagnosis and treatment of Vincent's disease. There is danger in pulling teeth in the presence of Vincent's disease."

Motion of defendant for judgment as of nonsuit at close of plaintiff's evidence was granted. And from judgment in accordance therewith plaintiff appeals to Supreme Court and assigns error.

*Connor, Gardner & Connor for plaintiff, appellant.*

*Lucas & Rand and Z. Hardy Rose for defendant, appellee.*

WINBORNE, J. Did the trial court err in rendering judgment as of nonsuit from which this appeal is taken? This is the only question here presented. And taking the evidence offered by plaintiff, as shown in the case on appeal, in the light most favorable to plaintiff, and giving to plaintiff the benefits of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom, as must be done in considering a motion for judgment as of nonsuit, G.S. 1-183, we are of opinion and hold that the evidence is insufficient to carry the case to the jury.

The burden was on plaintiff to show by evidence not only that defendant was negligent as alleged in the complaint, but that her negligence was the proximate cause, or one of the proximate causes of the intestate's death. The proof should have been of such character as reasonably to warrant the inference required to be established, and not merely sufficient to raise a surmise or conjecture as to the existence of the essential fact. *Smith v. Wharton,* 199 N.C. 246, 154 S.E. 12.

The plaintiff contends that there is error in the judgment below in several respects: First: It is contended that the defendant, in extracting the teeth of intestate, was practicing dentistry without a license so to do, in violation of the statute, G.S. 90-29, enacted for the protection of the public, and in the interest of public safety, for which a penalty is prescribed by the provisions of G.S. 90-40; that, hence, she was guilty of negligence *per se;* and that the evidence tends to show that such negligence was the proximate cause, or one of the proximate causes of the pain the intestate suffered, and of her subsequent death.

As to this first contention: the mere want of a license to practice dentistry does not raise any inference of negligence. If an unlicensed dentist exercises the requisite skill and care in administering treatment to a patient, he is not liable in damages for injury to the patient, merely because of his want of a license. 41 Am. Jur. 202. *Brown v. Shyne,* 242 N.Y. 176, 151 N.E. 197, 44 A.L.R. 1407; *Hardy v. Dahl,* 210 N.C. 530, 187 S.E. 788.

In the *Hardy case,* in which the plaintiff sought to hold defendant, an unlicensed naturopathist, liable for alleged wrongful death, it is said in opinion by *Devin, J.:* "The fact that the defendant was engaged in treating patients without having obtained license so to do, in violation of C.S. 6708, was not evidence of negligence in the treatment of plaintiff's intestate . . . The question was not whether he was licensed, or not, but whether he exercised proper care in the treatment of a patient. As was said in *Brown v. Shyne* . . . 'Unless the plaintiff's injury was caused by carelessness or lack of skill, the defendant's failure to obtain a license was not connected with the injury.'" And the opinion there concludes that "if defendant has been engaged in treating diseases in violation of the statute, he is liable to indictment, and, upon conviction, to suffer the prescribed penalty, but in a civil action, bottomed upon the law of negligence, the failure to possess a State certificate is immaterial on the question of due care."

And in keeping with the ruling in the *Hardy case,* while it is provided by statute, in this State, that the practice of dentistry without a license is forbidden, G.S. 90-29, for violation of which, upon conviction, a punishment is prescribed, G.S. 90-40, the failure to possess such license is immaterial on the question of due care.

Second : It is contended that defendant, in practicing dentistry, without a license so to do, was required to exercise the care and skill of a licensed dentist. This appears to be the law. See *Hardy v. Dahl, supra.* And "dentists, in their particular fields, are subject to the same rules of liability as physicians and surgeons." *Smith v. McClung,* 201 N.C. 648, 161 S.E. 91, citing *McCracken v. Smathers,* 122 N.C. 799, 29 S.E. 354, and *Nash v. Royster,* 189 N.C. 408, 127 S.E. 356.

In *Nash v. Royster,* it is stated that the law holds a physician or surgeon "answerable for any injury to his patient proximately resulting from a want of that degree of knowledge and skill ordinarily possessed by others of his profession, or for the omission to use reasonable care and diligence in the practice of his art, or for the failure to exercise his best judgment in the treatment of the case."

And in the case of *McCracken v. Smathers, supra,* the Court held that the degree of care and skill required of a dentist to his patient is that possessed and exercised by the ordinary members of his profession.

In the light of these principles, plaintiff in the present case contends, in the first place that there is evidence from which a jury might reasonably find that defendant, in extracting the teeth of intestate, failed to use reasonable care, that is, was negligent in the way and manner she performed the operation, and that such negligence was the proximate, or one of the proximate causes of the wrongs of which complaint is made. As to this contention, evidence is lacking as to how defendant extracted the teeth, whether she did or did not perform the operation in keeping with the care required of a licensed dentist. The evidence on which plaintiff relies is purely conjectural and speculative. Such evidence is insufficient to support a finding that defendant extracted the teeth in a negligent manner, that is, failed to exercise due care in extracting them.

In the next place, plaintiff contends that all the evidence shows that defendant lacked the knowledge and skill ordinarily possessed by members of the dental profession; that a dentist possessing such knowledge and skill, upon examination of intestate's mouth, would have detected the symptoms of Vincent's disease, or trench mouth, with which intestate was suffering, and would have so diagnosed her condition, and, upon such diagnosis, would have known that it would be dangerous to extract teeth in the presence of such disease; and that, hence, in extracting the teeth of intestate under such circumstances and conditions defendant negligently violated the duty she owed to the intestate, which negligence proximately caused or contributed to wrongs of which complaint is made.

As to this contention, it is conceded on this record that defendant lacked the knowledge and skill of a licensed dentist.

But the evidence offered by plaintiff fails to show that defendant's lack of knowledge and skill in dentistry was the proximate cause or one of the

proximate causes of the wrongs alleged by plaintiff. And in this connection, there is evidence that in the study of dentistry there is a course in oral pathology, the science that treats of diseases of the mouth, including Vincent's disease, and that there is danger in pulling teeth in the presence of this disease. There is no evidence as to what was the condition of the mouth of intestate on 18 August, 1947, the day the teeth were extracted. While Dr. Barnes, in examining intestate on 22 August, found her gums swollen and her mouth inflamed, and detected odors characteristic of Vincent's disease, he was unwilling to give an opinion as to whether these conditions existed on 18 August, 1947. And Dr. Rasberry testified that he predicated his opinion upon the impression that Dr. Barnes had testified that in examining intestate on 22 August he found the "one, two and three things necessary to diagnose it as Vincent's disease, general mouth infection, ulcers in the mouth, white caps in the ulcers." And the record fails to show that Dr. Barnes so testified. Moreover, Dr. Rasberry says that if only two of these essentials were present, he would not give it as his opinion that intestate had Vincent's disease on 18 August, and, furthermore, if all three conditions existed, he would not make a diagnosis without a smear test. Thus the evidence is insufficient to support a finding by the jury that intestate had Vincent's disease at the time her teeth were extracted by defendant. Hence, no causal relationship is shown.

The judgment below is
Affirmed.