W. M. NANCE, JR., by His Next Friend, W. M. NANCE, v. DR. J. M. HITCH.

(Filed 12 June, 1953.)

**1. Trial § 22b—**

Defendant's evidence which is not in conflict with that of plaintiff and which explains or makes clear the evidence offered by plaintiff may be considered on motion to nonsuit.

**2. Trial § 22a—**

On motion to nonsuit, plaintiff's evidence and so much of defendant's evidence as is favorable to plaintiff or tends to explain or make clear that which has been offered by plaintiff, will be considered in the light most favorable to plaintiff, giving him the benefit of every reasonable intendment and inference to be drawn therefrom. G.S. 1-183.

**3. Physicians and Surgeons § 14—**

The rule that a physician or surgeon may not be held liable to a patient if he possesses the knowledge and skill ordinarily possessed by others of his profession and uses reasonable care, diligence and skill in the practice of his art, *is held* applicable to a physician practicing in the special field of dermatology in the use and manipulation of an X-ray machine.

**4. Physicians and Surgeons § 19—**

The burden is upon plaintiff in an action for malpractice to show that defendant physician was negligent as alleged in the complaint and also that such negligence was the proximate cause or one of the proximate causes of plaintiff's injury.

1—238

**5. Physicians and Surgeons § 20—**

   Evidence tending to show that plaintiff suffered a third degree burn to his heel following X-ray treatment administered by defendant physician to plaintiff's heel in removing a wart, *is held* insufficient to overrule nonsuit on the theory that such injury would not have resulted in the ordinary course of such treatment if proper care and skill had been used, when plaintiff's own expert testimony, together with expert testimony for defendant, is to the effect that such burns do occur at times notwithstanding the best care and skill and caution in the use of X-ray therapy. Such evidence negatives the applicability of *res ipsa loquitur.*

**6. Same—**

   The contention that defendant physician was negligent in permitting his nurse to administer X-ray therapy contrary to the accepted practice of the profession is not raised when there is positive testimony that the physician and not the nurse administered the treatment and the only evidence to the contrary is plaintiff's statement modified by his averment that he was not positive who gave him the X-ray treatment.

APPEAL by plaintiff from *Godwin, Special Judge,* at September Civil Term, 1952, of WAKE.

Civil action to recover for personal injury allegedly resulting from actionable negligence in the X-ray therapy treatment administered by defendant to wart or tumor of skin on plaintiff's heel.

Plaintiff alleges in his complaint substantially these facts: That defendant is a registered and duly licensed physician to practice medicine in the State of North Carolina, and holds himself out as one qualified to diagnose and treat diseases and other maladies of the skin; that during the month of January, 1948, defendant took plaintiff, eleven years of age, as a patient, and agreed to treat, and did treat him for the removal of a wart or tumor on his heel by means of X-ray therapy; that defendant administered said X-ray therapy or treatment in such manner and applied same in such amounts that the treated area of plaintiff's heel assumed a pink and unnatural color and became tender; that subsequently there developed in said area a boil-like lesion, and the skin and tissues of the heel began to deteriorate; that, though defendant was treating plaintiff, this condition continued to become worse, for more than a year; and that plaintiff has become partially crippled.

And plaintiff alleges, upon information and belief, that defendant carelessly and negligently administered said X-ray therapy, thereby causing irradiation injury to the skin, tissues and bone of the heel, in that he caused plaintiff to be exposed to excessive amounts or dosages of X-ray . . . for excessive periods of time, when "defendant knew or in the exercise of ordinary care should have known that such exposure . . . would cause irradiation injury to the exposed areas," proximately causing the injury of which complaint is made.

Defendant, answering, admits that he is a duly licensed physician to practice medicine in the State of North Carolina, holding himself out as one qualified to diagnose and treat diseases and maladies of the skin; that on 31 December, 1947, plaintiff became a patient of defendant for treatment and removal of a wart or tumor on the heel of his left foot; and that in the treatment of plaintiff by defendant X-ray therapy was administered. And defendant avers that he possesses the requisite degree of learning, skill and ability necessary to the practice of his profession, and which others similarly situated ordinarily possess; that the treatment of plaintiff was done in a skillful manner and according to approved methods, and was the usual and customary treatment in cases of the character from which plaintiff was suffering, and that he, the defendant, exercised reasonable and ordinary care and diligence in the use of his skill, and in application of his knowledge, and that treatment was in accordance with his best judgment, and the judgment of practitioners possessing the same knowledge and skill. On the other hand, defendant denies all allegations of negligence.

Upon trial in Superior Court plaintiff W. M. Nance, Jr., and his mother and his father testified as witnesses in his behalf. Their testimony tends to show that on 31 December, 1947, William M. Nance, Jr., then nine years of age, having a wart about the size of a nickel on his heel, was taken by his parents to defendant Dr. J. M. Hitch for examination,— having in view the removal of the wart. Dr. Hitch suggested X-ray treatment, and on that day gave the first X-ray treatment. Other X-ray treatments were given on 7 January, and 14 January, 1948. Plaintiff testified in early part of his direct examination that the second treatment was given by the nurse, but later, on such examination, stated: "I believe I said that on the second and third visits the nurse administered the X-ray treatments. I am not positive who gave the X-ray treatments the second and third times."

The father of plaintiff gave this description of the first treatment: "After Dr. Hitch examined the wart I think he took a knife and trimmed the wart. My wife and I were standing right by him. Then he cut a shield and then put him on a table on his stomach . . . and he instructed the nurse what to give him or how much to give him . . . He took the machine and put it right there almost on his foot, put it so it wouldn't have been more than half an inch away from his foot and then he instructed the nurse as to how much to give him and during the time he was there he took a little pad, was cutting it out and showing us how to put a pad on his heel so he could wear his shoe,—a pad for his heel . . ."

Then on cross-examination, the father continued: ". . . I went into the room the X-ray machine was in. Dr. Hitch prepared the shield to be used in connection with the treatment. The X-ray machine was a

cone-shaped thing, had a cone-shaped thing right at its end that fitted down to the area to be treated, the heel or whatever that area was. This cone-shaped thing was fitted down at his heel or I might say it wasn't more than half an inch from his heel. He pulled it right down over it. I stayed there during that treatment. Dr. Hitch advised that he wanted to give him another treatment in about a week and told me what day to send him back to him, and Billy was sent back to him as directed."

Then plaintiff further testified: ". . . I went back on the 7th and 14th of January for further treatment . . . In about ten days . . . I did go back to see him . . . Dr. Hitch examined my heel and I told him the wart had fallen off about two days before that. The place where the wart came out . . . it left something like a scab . . . I went back to Dr. Hitch's office in a few days after that . . . at which time the place where the wart had been had healed up a little. I don't remember Dr. Hitch at that time requesting me to come back a few days later, but I did go back on the 1st day of March, 1948, or around that date. My heel was doing nicely but it was still red. On the 15th of March, 1948, I went back to Dr. Hitch and he examined my heel, at that time my heel was healing, I mean the raw place was not there, but it was red and . . . touchy . . . Dr. Hitch told me he thought it was going to be all right but that if it gave me any trouble to come back and see him . . . I . . . did go on the 1st day of June, 1950; at that time the place on my heel was sore and had been . . . all the time, in fact ever since the wart had come off it had been touchy and sort of tender so that I couldn't stand for anything to hit it . . . I was wearing shoes all of that time and had been going to school . . . walked to school . . ."

And testimony of plaintiff further tends to show that a day or two after the first X-ray treatment, the area around the wart became red and inflamed and it was tender; that the heel continued to be red and sore and "it had a sort of tingling feeling."

The mother testified: "After the X-ray treatment, Bill's heel was tender and it turned a pinkish color, I'd say in less than 48 hours after that and then that condition continued. It didn't regain its natural color, and we went back to him . . . Until the wart came off and even before within an area as large as a half-dollar it stayed pink or light red, I'd say pink-red. Following the series of treatments with X-ray and after the wart came off the heel stayed a light red; it never regained its natural color . . . It was January of 1950 that he (Billy) went back to Dr. Hitch. I went with my son on that occasion. I took him back . . . because . . . I noticed an ulcer where the wart had come off . . . and in discussing the situation with Dr. Hitch I told him that the area there had never regained its natural color and he told me that he had had to use an unusually large amount of X-ray to remove that wart because it

was large . . . He (Billy) had never had any X-ray treatment to his heel before I took him to Dr. Hitch. When I took him to Dr. Hitch for the removal of the wart, the skin around the wart was normal, was just the wart itself there. After the X-ray treatment, the skin on his heel turned pink."

And plaintiff further testified: "Prior to the time I had the first X-ray treatment, the wart was kind of sore . . . It gave me no trouble. There was no inflammation or redness around the wart before I had the first X-ray treatment. Between the time I had the X-ray treatment and the time the ulcer developed on my heel, I had not injured my heel in any way whatever. During that time I did not have any X-ray treatments from anybody, or any other doctors . . ."

And in respect to going back to Dr. Hitch in January, 1950, plaintiff testified: "I do not know the exact date I next saw Dr. Hitch, but when I went back to him he lanced my heel and gave me a shot of penicillin . . . My heel was inflamed and it was touchy . . . Following that I saw other doctors. I went to Dr. Hunt, and he operated on my heel. The operation never healed and then I went to Dr. Walter Neal. He gave me plastic surgery—a skin graft. . . . It was in 1950 when I went to Dr. Neal and he discharged me in 1952 . . ."

Then Dr. T. C. Worth, a specialist in radiology, that is, the use of X-ray in the diagnosis and treatment of disease, as witness for plaintiff, testified in pertinent part: ". . . On the 31st day of January, 1951, I had the occasion to make an X-ray picture of Billy Nance's heel . . . the left heel, which shows that there is a very definite defect in the tissue overlying the heel and area which I would say measures about half an inch . . . adjacent to this area of defect in the bone that we thought very questionable and which might be due to some disturbance in the blood supply of the bone in that area; we did not think there was any evidence of any inflammation of . . . the bone; but we did think there might be some disturbance in the blood supply of the bone. There are many things that can cause a disturbance in the blood supply, but I knew the history of this boy, which helped me some. Knowing the history of the boy, and from my examination of the X-ray negative, I believe it was due to irradiation injury . . . X-ray . . . a form of irradiation . . ."

Then on cross-examination Dr. Worth continued: "I am familiar with and have knowledge of the history of this case, and I had knowledge that a wart had been removed from the heel of Billy Nance by X-ray. I will say that X-ray, or the use of X-ray in removing warts and in the treatment of warts in that area, is an approved method. I will say, though, that in spite of skillful treatment by the use of X-ray for the removal of warts and in exercising the very best of care that burns do sometimes occur.

"In treatment of this sort a cone is attached to the machine and the important thing is the distance between the skin and the target of the X-ray tube. Therefore the length of the cone is the important thing to consider, and not how close the end of the cone is to the patient's skin, at all. If you use a long cone you will therefore have a long target skin distance, and if you use a short cone, it will therefore be short. The length of the cone is important in determining how much X-ray would be delivered to a skin lesion. The distance of the cone controls the distance that the X-ray itself is from the point of contact, it limits it; you cannot get any closer than the end of the cone. The cone is placed there for that protection, for that purpose, plus the fact that it keeps the X-ray in one place without letting it scatter around . . . From the history of this patient that I had that was given to me of the wart on Billy Nance's heel, I would as a radiologist have given to him X-ray treatment for the removal of that wart."

Then on re-direct examination Dr. Worth continued: "The X-ray machine if improperly used is a very dangerous instrument. It is customary for the radiologist to at all times give his own treatments . . . they don't generally turn them over to a nurse, to give them."

Then the doctor was asked these questions, to which he gave answers as shown: "Q. Following the X-ray treatment state whether or not it is usual for the area to become pink or red? A. Depending on the dosage, . . . used it is customary for it to become pink. If it is an ordinary dose or a safe dose, the condition will clear up within two or three days. Q. State whether or not if it doesn't clear up that that is an indication that a larger dosage than was safe was given? A. I wouldn't say that at all because there might be some other cause of irritation that might be superimposed on a lesion, but if there are no other causes superimposed, you would assume that there is a possibility that too much had been used."

The doctor concluded by saying that when he received the history of the case he was not advised "as to the amount of irradiation that was used."

Dr. J. Walter Neal, an expert in medicine and surgery, testified in pertinent part: ". . . I first saw Billy Nance on June 22, 1950. At that time he had an ulcerated lesion on his heel . . . After examining his heel and knowing the history of the lesion on his heel, I believe the injury was caused from X-ray therapy . . . X-ray treatment . . . the skin and the underlying tissues down to the bone were destroyed. They had eaten away an area of about half an inch in diameter. That type of burn is known as a third degree burn. A first degree burn is a reddening of the skin which requires no treatment, like getting a sunburn, doesn't even blister . . . A second degree burn is one that involves the skin and causes blistering of the skin and causes some pain and soreness. When it

involves the entire thickness of the skin and gets to the underlying tissues then that is called a third degree burn. I don't know whether or not a third degree burn of the type I have described is the usual and ordinary result of X-ray therapy. You see them caused from X-ray therapy occasionally, but it is not often . . ."

Then on cross-examination Dr. Neal continued: "I wouldn't say such burns often occur, but they do occur; they do occur in spite of skill and caution in using it." And in answer to this question, "And that is by virtue of the fact that some people can take more than others and some can take so much less, isn't that right?", the doctor answered: "Well, I don't know the cause, but I presume that is one way to explain it. I think some people are more sensitive to it than others, just like some people are more sensitive to the sun's rays than others. There is no way to determine how sensitive a person is to that kind of irradiation, I believe, before you administer the X-ray, I don't know of any way, but some of the radiologists may be able to tell you about that . . ."

And the doctor concludes by saying, "I don't know X-ray therapy."

Motion of defendant to dismiss the action on ground that plaintiff has failed to make out a *prima facie* case.

Defendant offered evidence: He, himself, testified in detail (1) As to his professional education, training and experience, and recognition as a physician, duly licensed—more particularly in the field of dermatology, the treatment of diseases of the skin, in which X-ray is commonly used. And (2) as to: (a) his treatment of plaintiff, W. M. Nance, Jr., for the removal of a wart on his heel by means of X-ray therapy, (b) the mechanism and proper operation of an X-ray machine, (c) the make and operation of his X-ray machine—one that is approved and in general use in his profession in the treatment of skin diseases, (d) the approved method of, and formula for X-ray treatment for removal of warts,—which he followed and used in treatment for the removal of the wart on plaintiff's heel, on 31 December, 1947, 7 January, 1948, and 14 January, 1948; and (e) the condition of the plaintiff's heel subsequently.

As to this last subject: Defendant said: "I saw him on January 26, 1948 . . . The wart had disappeared . . . two days prior . . . leaving a clean but tender base where it had disappeared. I saw him again on February 2, 1948. At that time my notations say his heel was clean and healing slowly, and I had him continue on the same treatment . . . simply the use of an ointment . . . I saw him again on February 16. My notation on the condition of his heel then says 'about healed.' I saw him again on March 1, 1948, and the condition of his heel 'still healing.' I saw him again on March 15, 1948, and my notation shows that it was healed and that the skin was slightly scaly . . . My notation shows that I suggested that any type of cream could be used to soften the scaliness

. . . and no further appointment was made. I saw him again on January 6, 1950, but I had not heard anything from him during the time between March 15, 1948, and January 6, 1950. Mrs. Nance came with him to my office on January 6, 1950 . . . My examination of his heel disclosed the heel to be moderately red with a small ulceration present and a slight tenderness in the central portion of it. I treated his heel at that time. He was given an antibiotic ointment to use and . . . penicillin muscularly and a rubber pad was prescribed for use over the heel to prevent the shoe from rubbing it too much, and his mother was instructed to cut down on his exercise and to obtain for his use a larger pair of shoes . . . I saw him again on the 7th. At that time I made a notation that the area was somewhat more tender than on the previous day, but that the central area of the ulceration had been largely freed of pus and debris, leaving a healthy appearing granulating mass of small, shallow ulcers. I cleaned the remaining debris and the ulcers out and the area was re-dressed and, as previously, ointment was given him and he was given another injection of penicillin. I saw him again on the 8th. I examined his heel at that time and it disclosed that it was improving; it was cleaner and less tender. I saw him again on the 12th of January, and made an examination of his heel, and it was improved over its previous condition. I did not see him any more after January 12 . . ."

The defendant continued: "When I first saw this boy on December 31, 1947, the area around the wart was of a red color; when he returned to me on the 7th of January, 1948, I would say there was no more discoloration of the area around the place than previously present and no more than one would expect with a raised lesion being confined and rubbed by shoes. When I saw him January 7, 1948, there was no condition about his heel that indicated to me that he had received any burn from X-ray . . . There wasn't anything about its condition, its color or otherwise, that indicated to me on January 14, 1948, that he had received any burn from X-ray treatment. With the use of the lead shield and the cone that was used on X-ray machine, no area of his heel could have been burned except that immediately over the wart. It would take at least two weeks to show any redness at all from the X-ray . . . The aluminum filter we used would tend to lengthen the time rather than shorten it."

And defendant, continuing, said: "There is no test that a practitioner can give a patient in order to determine the susceptibility of the patient to the X-ray. You would have to give a series of X-ray dosage to an area of the patient's skin and keep increasing the dosage until you burned it to find out how much that was, whether a smaller dose than the average, or not. But when we discovered how much he could take, the patient would already be burned under that kind of test; but there is no practical test that can be given. I do at times have unsatisfactory conditions or

results in the treatment of skin lesions, warts such as Billy Nance had, regardless of the care and skill that is used. I guess that these unsatisfactory conditions or results are attributed to the variability of human beings. Some individuals can take or stand more X-ray than others, as far as local reaction is concerned . . . The treatment that I administered to Billy Nance beginning on the 31st of December, 1947, and through March 15, 1948, is the usual treatment that is used by practitioners in treating a condition such as Billy Nance had."

Then on cross-examination defendant testified, in part: "When I saw him on January 6, 7, 8· and 12, it was my impression, it was my diagnosis . . . that he had cellulitis, which is an infection of the tissue . . . in a skin that had been previously irradiated and therefore was, perhaps, not quite as resistant to such infection as normal skin . . . The immediate cause of the ulcer was an infection . . . of his heel, which I think was probably due to trauma, to too short shoes . . . It was not the result of X-ray therapy . . . I would say he did not have too much X-ray. I am going on the basis that he had 750 R's each treatment. It would not produce a third degree reaction except in a rare individual who is hypersensitive to X-ray. There is never anything to indicate that· anyone is one of those rare individuals . . ."

Further on cross-examination defendant said: ". . . I did not delegate the authority to the nurse . . . I gave the treatment . . ." In this connection, Mrs. Pauline Batten Singleton, a registered nurse, as witness for defendant, testified that she was working for Dr. Hitch at the time he gave plaintiff the X-ray treatments; that Dr. Hitch adjusted the machine, and prepared the patient; that all she did was under the doctor's supervision, and "telling me what to do"; and that "the X-ray machine automatically turned itself off after the time expired that it was set for."

Defendant also offered expert testimony of Dr. J. L. Calloway, professor of dermatology at Duke University School of Medicine, teacher and practitioner, Dr. T. C. Worth, who had been on the stand as witness for plaintiff, Dr. Michael Bolus, licensed and practicing dermatologist at Raleigh, N. C., and Dr. Robert P. Noble, roentgenologist, practicing medicine and specializing in X-ray at Raleigh, N. C.

These testified in the main in answer to hypothetical questions based upon testimony of defendant. Briefly stated, their expert opinions, variously expressed, are:

(1) That the formula used by defendant in giving X-ray treatment to the wart on the heel of plaintiff is usually accepted by the profession as being proper treatment in such cases.

(2) That the X-ray machine used by defendant in treating plaintiff is one that is approved and in general use by the profession.

(3) That rays so administered do not produce redness, except in rare occasions, within ten days to twenty-one days, as variously estimated. Dr. Calloway said: "This particular quality of X-ray that we are speaking of, with the 3 mm of aluminum filter in this dosage, redness will never occur under two weeks. It is my opinion that with that formula used that any redness which appeared within a week could not have been the result of that X-ray therapy." Dr. Worth said: "Under treatment of that kind with filtered irradiation, in my opinion, it would be ten days or two weeks before there would be any redness, if at all." Dr. Bolus said: ". . . at least 10 days and usually 21 days . . . with filtering I don't think that it should become pink . . . It could have turned pink from some other cause . . ." And Dr. Noble said: "It is my opinion it would require the skin around the lesion of that kind to become red or pink from X-ray burns, if there were X-ray burns, to start in about ten days or two weeks . . ."

(4) That there is no method by which to determine the amount of X-ray a person can take without burning. Dr. Calloway testified: "It appears that some people are able to take more X-ray than others, in the same way that one person may be able to take more sunshine than another without burning, without reacting. Using filtered irradiation there is no way of anticipating what is going to happen . . . Burns occur at time when X-ray such as was used in this case is applied by a person who is learned and skilled in dermatology, even though skillfully applied, using every care and caution . . . I would not say it happens commonly but it does happen and it cannot, as far as I know, be predicted or prevented by any physical test before the use of the X-ray irradiation. There are many people who differ in their ability to react to an X-ray irradiation . . ." Dr. Worth expressed his opinion in this way: "By the administration of approved doses of X-ray therapy I have never had a third degree reaction treating a wart or skin trouble . . . But it happens to the most careful practitioner at times. It may happen to you no matter how much knowledge you have or how much skill you may use or how much care you may exercise it sometimes, maybe today, happens . . . It would not necessarily indicate that more than you intended to give had been given."

And Dr. Noble, in expressing his opinion, said: ". . . We find that they get more reaction in some people than in others, and there is no telling how that will be . . ."

Dr. Calloway also testified that "In the removal of a wart the size that has been described was on the heel of Billy Nance, following X-ray therapy, there is a natural weakening of the skin and tissue. X-ray in this dosage produces scarring, produces atrophy of the skin, and any scar, by and large, is a weaker piece of tissue than a normal piece of skin

because it does not have the blood supply that the normal skin has." And, again, that "such a scarred area reacts much more poorly after being traumatized,—has less ability to respond normally."

And Dr. Noble, in answer to this question, "After the removal of a wart there is naturally a deterioration, a breakdown of the tissues in that particular area, isn't there?", answered "Yes. You have got to do that to destroy it."

Dr. Walter S. Hunt, orthopedic surgeon, testified that he had occasion to see and treat William M. Nance, Jr., plaintiff in this case; that he was called to perform an operation on his left heel, and did so; and he said : "I found no damage to the bone."

Motion of defendant for judgment as of nonsuit made at close of evidence was allowed, and judgment was signed.

Plaintiff appeals therefrom to Supreme Court and assigns error.

*Bickett & Banks and W. H. Yarborough for plaintiff, appellant.*
*Brassfield & Maupin and Robert L. Savage, Jr., for defendant, appellee.*

WINBORNE, J.   Did the court below err in granting defendant's motion for a judgment as of nonsuit at the conclusion of all the evidence? This is the question presented on this appeal.

In considering such motion, "the defendant's evidence, unless favorable to the plaintiff, is not to be taken into consideration, except when not in conflict with plaintiff's evidence, it may be used to explain or make clear that which has been offered by plaintiff," *Stacy, C. J.,* in *Harrison v. R. R.,* 194 N.C. 656, 140 S.E. 598, citing *S. v. Fulcher,* 184 N.C. 663, 113 S.E. 769.   See *Rice v. Lumberton,* 235 N.C. 227, 69 S.E. 2d 543, where other cases in which this rule was applied are cited.   See also *Williams v. Robertson,* 235 N.C. 478, 70 S.E. 2d 692; *Ward v. Cruse,* 236 N.C. 400, 72 S.E. 2d 835; *Express, Inc., v. Jones.* 236 N.C. 542, 73 S.E. 2d 301.

Therefore, taking the evidence offered by plaintiff, and so much of defendant's evidence as is favorable to the plaintiff, or tends to explain and make clear that which has been offered by the plaintiff, as shown in the case on appeal, in the light most favorable to plaintiff, and giving to plaintiff the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom, as the law directs in considering a motion for judgment as of nonsuit, G.S. 1-183, this Court is of opinion and holds that the evidence is insufficient to carry the case to the jury on the issue of negligence of defendant as alleged in the complaint, and that the question posed merits a negative answer.

Text writers, interpreting the law as declared in courts of the land, say that "the rules governing the duty and liability of physicians and

surgeons in the performance of professional services generally . . . are applicable to them in the use and manipulation of an X-ray machine"; that "the degree of care, skill, and diligence required of an X-ray operator is fixed by that ordinarily possessed and exercised by others in the same line of practice and work in similar localities"; and that "such operator impliedly represents to his patient that he possesses the ordinary skill and learning of members of his profession, and that he will exercise reasonable skill, care and diligence in his treatment." 41 Am. Jur. 207, Physicians and Surgeons, Section 89. See also 70 C.J.S. 946, Physicians and Surgeons, Section 41.

And it is said that "this rule involves dual standards of skill and care, one having reference to the mechanical operation of the apparatus, and the other to the possession and exercise of the professional skill and care of the physician in his diagnosis and treatment of the patient's ailment in other respects than the mere operation of the machine"; and that "a physician who possesses the requisite skill and knowledge, and exercises ordinary and reasonable care and skill in the operation of an X-ray machine is not liable for damages for burns resulting from X-ray treatment in a proper case where no negligence is shown." 41 Am. Jur., pp. 207-8, Physicians and Surgeons, Section 89. See annotations on subject "Liability for injury by X-ray." 13 A.L.R. 1414, 26 A.L.R. 732, 57 A.L.R. 268, and 60 A.L.R. 259.

While this Court has not treated of this particular phase of duty and liability of physicians, the principles are consonant with the rules enunciated by this Court, and prevailing in North Carolina in respect to the duty and liability of physicians in the performance of professional services generally. See *Nash v. Royster,* 189 N.C. 408, 127 S.E. 356; *Grier v. Phillips,* 230 N.C. 672, 55 S.E. 2d 485; *Jackson v. Sanitarium,* 234 N.C. 222, 67 S.E. 2d 57; *Jackson v. Joyner,* 236 N.C. 259, 72 S.E. 2d 589.

In *Nash v. Royster, supra,* it is stated that the law holds a physician or surgeon "answerable for any injury to his patient proximately resulting from a want of that degree of knowledge and skill ordinarily possessed by others of his profession, or for the omission to use reasonable care and diligence in the practice of his art, or for the failure to exercise his best judgment in the treatment of the case."

Moreover, in the case of *McCracken v. Smathers,* 122 N.C. 799, 29 S.E. 354, this Court held that the degree of care and skill required of a dentist to his patient is that possessed and exercised by the ordinary members of his profession. And in *Smith v. McClung,* 201 N.C. 648, 161 S.E. 91, citing the *McCracken case,* the Court said that "dentists, in their particular fields, are subject to the same rules of liability as physicians and surgeons.

---

Accordant with the reasoning of these decisions, the rules governing the duty and liability of physicians and surgeons in the performance of professional services generally, may properly be applied to a physician practicing in the special field of dermatology, in the use and manipulation of an X-ray machine,—and this Court now so holds.

The burden is on plaintiff to show by evidence not only that defendant was negligent as alleged in the complaint, but that his negligence was the proximate cause, or one of the proximate causes of plaintiff's injury. The acts of negligence alleged are that defendant caused plaintiff to be exposed to excessive amounts or dosages of X-ray for excessive periods of time. Therefore this question arises: Is there sufficient evidence to support the allegations? The proof should have been of such character as reasonably to warrant the inference required to be established, and not merely sufficient to raise a surmise or conjecture as to the existence of the essential fact. *Smith v. Wharton,* 199 N.C. 246, 154 S.E. 12; *Grier v. Phillips, supra.*

Plaintiff contends that where it is shown that defendant was in exclusive control of a dangerous instrumentality, an X-ray machine, and following treatment by defendant, plaintiff sustained third degree burn, the case should be submitted to the jury. He invokes the rule stated by *Barnhill, J.,* in *Etheridge v. Etheridge,* 222 N.C. 616, 24 S.E. 2d 477, that "When a thing which causes an injury is shown to be under the control and operation of the party charged with negligence and the accident is one which, in the ordinary course of things, will not happen if those who have such control and operation use proper care, the accident itself, in the absence of an explanation by the party charged, affords some evidence that it arose from want of proper care."

In this connection, it is not disputed that the X-ray machine used by defendant was under his control and operation. And conceding that there is evidence tending to show that there was third degree burn to the heel of plaintiff following the X-ray treatment administered by defendant, the evidence is insufficient to show that the burn is one which, in the ordinary course of things will not happen if defendant used proper care. The evidence is to the contrary.

Dr. Worth testifying as witness for plaintiff stated: "I will say . . . that in spite of skillful treatment by the use of X-ray for the removal of warts and in exercising the very best care that burns do sometimes occur." And plaintiff's witness Dr. Neal said: "I wouldn't say such burns often occur, but . . . they do occur in spite of skill and caution in using it." Moreover, the testimony of defendant and of the doctors introduced by him, including Dr. Worth, is to the same effect. Hence the principle declared in the *Etheridge case* is inapplicable to the factual situation in hand.

Indeed, all the evidence offered, as shown in the record and case on appeal, negatives the applicability of the doctrine of *res ipsa loquitur*—that is, that the thing speaks for itself.

Plaintiff contends also that there is evidence that the X-ray therapy was administered by Dr. Hitch's nurse who admittedly is not trained in radiology. In this connection attention is directed to plaintiff's statement: "I believe I said that on the second and third visits the nurse administered the X-ray treatments. I am not positive who gave the X-ray treatment the second and third times." This statement is too uncertain to have probative value. Hence it will not be considered as evidence that the nurse gave the treatment,—a fact which both she and defendant say did not occur.

Moreover, a reading of the entire evidence leads to the conclusion that the plaintiff's case is one of those unfortunate results which in medical science and learning could not have been foreseen or predicted. The evidence fails to show that it is the result of any neglect or lack of care on the part of defendant. Therefore he may not be held liable for it.

The judgment from which this appeal is taken is

Affirmed.