D. J. HINCHER v. THE HOSPITAL CARE ASSOCIATION, INC.

(Filed 21 May, 1958.)

**1. Trial § 22b—**

Defendant's evidence which is not at variance with plaintiff's evidence but which tends to explain and clarify it, may be considered on motion to nonsuit.

**2. Trial § 24a—**

When the plaintiff offers evidence sufficient to constitute a *prima facie* case in an action in which the defendant has set up an affirmative defense, and the evidence of the plaintiff establishes the truth of the affirmative defense as a matter of law, a judgment of nonsuit may be entered.

**3. Insurance § 38— Evidence held to show that operation was for pre-existing condition within exclusion clause of hospital insurance.**

Plaintiff instituted this suit to recover medical expenses for a goitre operation performed subsequent to the date of the hospital policy sued on. Plaintiff testified to the effect that she had visited her doctor on several occasions prior to the application for the hospital policy in suit and had suffered similar symptoms both before and after making the application, but that the doctor did not tell her until after the policy was issued that she had a goitre. Deposition of the doctor, introduced by defendant, was to the effect that the goitre condition, for which the operation was performed, had its inception prior to the date of the application. *Held:* Plaintiff's evidence, together with defendant's evidence in clarification and explanation thereof, but not in contradiction therewith, establishes as a matter of law that the operation was for a condition which existed prior to the effective date of the policy, and therefore was within the exclusion clause of the policy.

**4. Trial § 30—**

Ordinarily, where all the evidence bearing upon an issue points in the same direction, with but one inference to be drawn from it, an instruction to find in support of such inference, if the evidence is found to be true, is proper.

APPEAL by defendant from *Crissman, J.*, and a jury, at January Civil Term, 1958, of WILKES.

: Civil action to recover for hospital and surgical benefits under a certificate of insurance of the Blue Cross type.

The plaintiff sued to recover for hospital and surgical expenses covered by the insuring clauses of the certificate. The defendant denied liability, relying upon exclusion clauses which provide that none of the policy benefits will be available to any person hospitalized or operated upon "for any condition, disease, or injury which existed on or before the effective date" of the certificate.

The defendant alleged that the plaintiff's surgical operation was due to a condition existing on the effective date of the certificate. This plea, by way of affirmative defense, presented the only controverted issue in the trial below.

The evidence bearing on the issue may be summarized as follows: The plaintiff made application for the certificate on 10 November, 1955. It became effective 1 January, 1956. On 4 May, 1956, while the certificate was in full force and effect, the plaintiff was admitted to the Davis Hospital in Statesville and underwent surgery for a goitre condition. She incurred hospital and surgical bills totalling $343.80, which the defendant has refused to pay.

On cross-examination the plaintiff testified: "I know Dr. Warner of Statesville; he was connected with the Davis Hospital in Statesville. Dr. Warner saw me with regard to my illness, my physical condition, but I don't recall the first time that he did see me. I didn't know to keep the dates and so I didn't keep the dates. He saw me in September, 1955, but I can't recall whether he saw me on the 10th day of September, 1955. As a matter of fact, I don't recall whether he saw me three times in September, 1955, or not. I didn't keep the dates, but I do recall going to Davis Hospital in September, 1955. I don't recall how many times I had seen Dr. Warner before I was admitted to the Davis Hospital in September, 1955, but I don't recall the number of times. I didn't keep the dates and therefore I don't know whether I saw Dr. Warner twice in October, 1955, or not. I can't recall offhand whether I saw Dr. Warner twice during October, 1955; I mean I have seen him a lot. I don't know whether it was twice during the month of October, 1955. . . . I won't say whether it was six times prior to November, 1955, because I don't know. . . . I saw Dr. Warner before I signed the application but I don't recall how many times I saw him before I signed it. . . . Well, I had seen him more than one time prior to November, 1955, but I won't say how many times because I didn't recall how many times, . . .

"When I went to the hospital on May 4, 1956, at the time they operated during that stay in the hospital, they operated on my neck, that is all I know. I don't know whether I had a goitre. *A goitre is what the*

*doctor was supposed to have operated for. That is what he told me he operated for.* (Italics added.)

"Well, I have had a choking for a long time and headaches and I still have it, and have had that choking for some time. I have never been to the doctor with a goitre in my throat. I have never went to him with intentions of saying that I had a goitre because I never had thought that I ever had and I still don't. I still have the choking and am not any better; in fact, I am worse than I was before the operation. When I went to see Dr. Warner the first time in September, 1955, I complained to the doctor of nervousness and recurrent choking and tightness in my throat and that I had trouble swallowing. I won't re-call the date because I don't know, but I have told him that several times when I would go to him because it was right. He is the doctor and I did not know what I had except I knew I had a headache and a choking and that is all I knew. I just told the doctor how I felt and he made some examinations and had two metabolism tests made and he made a blood count and urinalysis and other tests and they ran several tests on me. I don't know exactly when my choking started because I didn't know I would have to keep the dates, *but I had this choking feeling when I first went to see Dr. Warner.* When the doctor took this goitre out in May, 1956, he did not tell me when it had started and he did not tell me when I first came to see him in September, 1955, that I had a goitre." (Italics added.)

At the close of the plaintiff's evidence the defendant moved for judgment as of nonsuit. Motion overruled. Defendant excepted.

The defendant offered the deposition of Dr. W. A. Warner, taken by the plaintiff. In essential part it is as follows:

Direct examination by Mr. Osteen: "My name is W. A. Warner and I am a physician practicing at Davis Hospital in Statesville. I am engaged in the general practice.

"I know Dorothy J. Hincher and I have examined this woman. I first saw her on September 10, 1955, and have had occasion to examine her since that time. I examined her on May 4, 1956, and have examined her a number of times since that time. She is still under my care.

"When I first saw Mrs. Hincher on September 10, 1955, she was complaining of nervousness, recurrent bouts of choking, tightness in her throat, trouble swallowing. She stated she had had no previous goitre history and that there had been no weight loss, no increased appetite, etc. Physical examination revealed blood pressure of 136/84, pulse 84. Examination of the thyroid, I thought, was diffusely enlarged, non tender, freely movable. It was my feeling at this time that the patient had a goitre and in all probability the goitre was toxic. She was instructed to return September 16, 1955, at which time she stated she felt terrible. She had been nervous all week with frequent headaches.

She was hospitalized then and the following studies were done: BMR was +1 and the repeat examination was +3. Blood cholesterol was 117 mg.%. All other laboratory work including complete blood count, urinalysis, sedimentation rate and Wasserman were normal. At that time I asked Dr. John Rosser, member of our surgical staff, to examine her thyroid gland. His opinion as written on the consultation sheet was 'Thyroid gland slightly enlarged but not enough to cause symptoms, it would seem to me. I advise observation and conservative therapy for the time being.'

"I also asked Dr. J. R. Stewart, who was our otholaryngologist, to laryngoscope Mrs. Hincher to find out whether this thyroid was compressing her throat. She was therefore laryngoscoped on September 22nd and no pathology was visualized. Because all studies indicated this thyroid was non-toxic, patient was discharged on medical care. I next saw her on October 8, 1955, when she stated she felt better. I next saw her on October 29, 1955, when she said she continued to feel better in most ways, that is her headaches were less frequent. She stated she was still quite nervous, was still having choking and smothering spells. It was felt that there was no change in the physical examination at this time. She was next seen on November 14, 1955, when she said she had a splitting headache for the previous two days and that her nervousness was worse. She was seen again December 3, 1955. Her symptoms were essentially the same as on the previous visit. She was seen again on the next day when she said she had had a headache for the previous week. . . .

"I next saw her on January 28, 1956, when she complained of nervousness and trembling hands. Her next visit was on February 11, 1956, when she stated she had had a migraine headache all week, that she was unable to sleep and was 'choking again.' I next saw her on March 3, 1956, when she stated she had been feeling better until 2 or 3 days prior to the visit. Since then she had been more nervous than usual. She returned to my office on March 15th complaining of a generalized headache.

"I next saw her on April 7, 1956, at which time she stated her headache was still persisting. She was next seen April 23, 1956, again with another headache. She thought her nervousness was less at that time. She stated she was again 'choking' in her throat. I next saw her on May 4, 1956, when she said she was feeling worse. It was her feeling that her 'choking' had now reached a stage where 'I cannot stand it any longer.' She was hospitalized on that date. Laboratory studies at that time showed a basal metabolism of +3, normal urinalysis, blood count, serum calcium 9.4 mg.% and a serum cholesterol of 223 mg.%. At this time I referred her to Dr. Paul Lanier Ogburn, another surgeon

on our staff. He thought her thyroid was enlarged but it was also his feeling that the thyroid was non-toxic. On May 9, 1956, I recorded in the progress notes: 'Continues to have choking, smothering, tension headaches. Patient is a severe Psycho-neurotic, but I still feel that a subtotal thyroidectomy would be justified on the basis that she may have some obstructive tissue.' Consequently, she was scheduled for surgery on May 14, 1956, and a subtotal thyroidectomy was done. At that time it was found that each thyroid lobe was approximately two times normal size with the left lobe being slightly larger than the right.

"The headaches, nervousness, could have come from conditions other than goitre trouble; in fact, she has continued to have headaches since her surgery. I thought she had a goitre the first time I saw her back in September, 1955, but at that time that it was relatively dormant. Based on my findings and my examination of Mrs. Hincher, I have an opinion satisfactory to myself and based on a reasonable medical certainty that the goitre was present prior to January 1, 1956, and that it was dormant or non-toxic. After January 1, 1956, it was my feeling that Mrs. Hincher became worse in the last two or three months prior to her surgery. It was my feeling that her goitre had probably increased in size.

"A goitre condition is not comparatively a simple condition to diagnose. A toxic goitre is relatively easy to diagnose, but a simple colloid goiter causes symptoms by mechanical obstruction and as such cannot be measured accurately externally. Based on my findings, on my examination of Mrs. Dorothy J. Hincher, I have an opinion satisfactory to myself based on a reasonable medical certainty as to whether or not the goitre condition could possibly not have existed prior to January 1, 1956, and it is my opinion that the goitre did exist prior to January 1, 1956, but probably increased in size several months prior to her surgery."

Cross Examination: "The condition for which she was admitted to Davis Hospital on May 4, 1956, was substantially the same physical condition that I found upon my seeing Mrs. Hincher the first time in September, 1955. In other words, she had nervousness, choking, tightness in the throat, trouble with swallowing, and these were the symptoms which I have specified and described and she had those symptoms. In my opinion, Mrs. Hincher had this goitre when I first saw her in September, 1955. The operation which was performed was done by Dr. Ogburn and he removed the goitre during the hospital admission of May 4, 1956."

At the close of all the evidence, the defendant renewed its motion for judgment as of nonsuit. Motion denied. Defendant excepted.

The defendant in apt time tendered in writing the following request for special instruction: "Gentlemen of the jury, I charge you that if

you believe the evidence in this case and find the facts to be by the greater weight of the evidence as all the evidence tends to show, it will be your duty to answer the first issue YES." Request denied. Defendant excepted.

The following issue was submitted to the jury and answered as indicated: "Was the hospitalization and the surgical operation upon the plaintiff due to a condition existing as of the effective date of the certificate? Answer: NO."

The parties having stipulated that the plaintiff should recover the sum of $343.80 in the event the issue should be answered in her favor, judgment was entered in accordance with the stipulation. The defendant appeals.

*Claude V. Jones for appellant.*
*W. H. McElwee and W. L. Osteen for appellee.*

JOHNSON, J.    The defendant's chief assignments of error challenge the rulings of the trial court in denying its motion for judgment as of nonsuit and in refusing to give the jury the peremptory instruction as requested by the defendant.

"Defendant's evidence which is not at variance with plaintiff's evidence but which tends to explain and clarify it, may be considered on motion to nonsuit." *Robbins v. Crawford,* 246 N.C. 622, 99 S.E. 2d 852. See also *Nance v. Hitch,* 238 N.C. 1, 76 S.E. 2d 461, and cases there cited.

It is also established by our decisions that, "When the plaintiff offers evidence sufficient to constitute a prima facie case in an action in which the defendant has set up an affirmative defense, and the evidence of the plaintiff establishes the truth of the affirmative defense as a matter of law, a judgment of nonsuit may be entered." See also *Thomas-Yelverton Co. v. Ins. Co.,* 238 N.C. 278, 77 S.E. 2d 692; *Goldberg v. Ins. Co.,* 248 N.C. 86, 102 S.E. 2d 521.

In the instant case it is apparent that various phases of the testimony of Dr. Warner, given as a witness for the defendant, harmonize with and tend to explain and clarify the plaintiff's testimony, without in any manner contradicting it. And when the plaintiff's testimony is considered in connection with the clarifying phases of the defendant's evidence, it is manifest that the defendant's affirmative defense is established as a matter of law by the plaintiff's evidence. We conclude, therefore, that the ruling of the trial court in denying the defendant's motion for judgment as of nonsuit must be held for error and reversed. This being so, it is not necessary to discuss at length the question whether the court also erred in denying the defendant's request for a

peremptory instruction. Ordinarily, where all the evidence bearing upon an issue points in the same direction, with but one inference to be drawn from it, an instruction to find in support of such inference, if the evidence is found to be true, is proper. *Commercial Solvents v. Johnson,* 235 N.C. 237, 243, 69 S.E. 2d 716, 721. Here it is manifest that the defendant was entitled to a peremptory instruction. For correct form of instruction, see *Shelby v. Lackey,* 236 N.C. 369, 72 S.E. 2d 757; *Peek v. Trust Co.,* 242 N.C. 1, 11, 86 S.E. 2d 745, 753; *Rhodes v. Raxter,* 242 N. C. 206, 210, 87 S.E. 2d 265, 268; *Commercial Solvents v. Johnson, supra.*

The judgment below will be

Reversed.