ARTHUR E. WAYNICK v. MARC J. REARDON AND DUKE UNIVER-
SITY, INC.

(Filed 22 August, 1952.)

**1. Trial § 23a—**

　　If plaintiff's evidence and so much of defendants' evidence as is favor-
able to plaintiff, amounts to more than a scintilla of evidence tending to
establish the affirmative of the issue, defendants' motions to nonsuit are
properly overruled.

**2. Hospitals § 6—**

　　Where it appears that plaintiff did not select his surgeon but was oper-
ated upon by the assistant resident in surgery who was employed and paid
by the hospital, such surgeon is an employee of the hospital and it is liable
for such surgeon's actionable negligence in the performance of his duties
in the scope of his employment.

**3. Same: Physicians and Surgeons § 20—Evidence held sufficient for jury
on issue of surgeon's negligence.**

　　The evidence tended to show that plaintiff underwent a lumbar sympa-
thectomy for peripheral vascular disease, which he was advised would take
only some forty-five minutes, that he was in the operating room over seven
hours, that during the course of the operation a vein was inadvertently
punctured, that in an attempt to control the bleeding other perforations
of the blood vessel occurred, that thereupon the chief of the surgical serv-
ice of the hospital was called in, who, upon ascertaining the patient's con-
dition, abandoned all efforts to repair the blood vessels, but tied off and
cut the torn vessels together with connecting fibrous tissue *en masse*. The
evidence further tended to show that the resulting interference with circu-
lation caused gangrene in the patient's left leg, making it necessary to am-
putate it, first below the knee and later after a debridement, above the
knee, and that later a blood clot in the right leg caused gangrene, making it
necessary to amputate plaintiff's right leg. *Held:* The evidence was suffi-
cient to be submitted to the jury on the issue of the surgeon's negligence in
an action against the surgeon and against the hospital employing him.

JOHNSON, J., concurs in result.

APPEAL by plaintiff from *Williams, J.,* September Term, 1951, ALA-
MANCE.

Civil action to recover damages for alleged injury caused by the negli-
gence of the defendants.

For convenience in narration, the defendant, Marc J. Reardon, will be
referred to in the statement of facts and in the opinion as Dr. Reardon,
and the term, Duke Hospital, will be used to designate the hospital service
of the defendant, Duke University, Inc., and will include within its scope
said corporate defendant.

On 18 August, 1947, plaintiff, suffering with fallen arches and pain in
his feet, entered the orthopedic clinic of Duke Hospital, where he received

WAYNICK *v.* REARDON.

shoe supports and instructions to use specified home treatments. He was requested to return for further observation and accordingly returned to the clinic on 3 September, 1947. At that time all significant symptoms were restricted to his left foot. Upon further examination, plaintiff was referred to the surgical department, where an operation was suggested. He had never undergone surgery and greatly feared an operation. No hospital bed was then available and plaintiff returned to his home. He was notified of the availability of a bed and on 8 September, 1947, entered Duke Hospital as a patient and was assigned to a bed in Halstead Ward. At this time, the plaintiff was able to perform his usual work and to walk without apparent distress.

At the time plaintiff became a patient in Duke Hospital, Drs. Marc J. Reardon, S. S. Ambrose and J. W. Kelley were not engaged in private practice, but were pursuing post-graduate training at Duke Hospital and their duties in this capacity included the care and treatment of patients assigned to Halstead Ward. Dr. Reardon was classified as Assistant Resident in Surgery and in addition to his maintenance was paid a salary of $41.67 per month. Drs. Ambrose and Kelley were internes and aides or assistants to Dr. Reardon. The operative procedure at Duke Hospital was carried out by what is known as operating teams consisting of the doctor who actually uses the surgical tools and two or more assistants or helpers who aid him in the operation. Plaintiff, as a patient on Halstead Ward, had no choice of doctors.

The diagnostic considerations of plaintiff's condition ranged all the way from Buerger's disease to arteriosclerosis. No definite diagnosis was ever reached. It was, however, concluded that plaintiff had some type of occlusive vascular or peripheral vascular disease. One of the accepted forms of treatment for such a condition is a lumbar sympathectomy. This involves the removal by surgery of nerve tissue and ganglia which control the muscles of the blood vessels, thereby reducing the spasms of the blood vessels by paralyzing the muscles. This allows the vessels to open up and increases the flow of blood. The blood supply is controlled largely by the sympathetic nervous system. Whatever may have been the cause of plaintiff's trouble, his disease appeared to have been in the early stages. Of the non-operative treatments developed for plaintiff's condition, only pavorin was used.

Without a complete and satisfactory diagnosis, plaintiff was persuaded by agents of Duke Hospital to submit to what was described to him as a minor or simple operation requiring only a small incision in his back and the clipping of a nerve, which operation would necessitate his being in the operating room only 40 to 45 minutes. Instead, an incision, 8 inches in length, extending from the 9th rib to the rectus sheath was made in the body cavity through which all internal organs were lifted out of

the way for the purpose of exposing the left lumbar sympathetic nerve and ganglia. These are located along and in front of the backbone or spinal column. The operation proceeded without apparent difficulty and as the nerve and three ganglia were being removed, the nerve chain snapped and the fourth ganglion disappeared behind a mass of tissue. While exploring for the fourth ganglion, Dr. Reardon discovered that the two large vessels which control the flow of blood to and from the left lower extremities were bound together by a mass of fibrous tissue and he inadvertently punctured one of these large vessels. Profuse, massive and uncontrolled bleeding followed. The mass of fibrous tissue made these large vessels easy to tear and more difficult to separate and repair, and in his effort to part this mass of fibrous tissue, Dr. Reardon perforated or produced fissures in the vessels in a number of other places. The bleeding became more profuse and plaintiff's condition became precarious. Dr. Reardon then made an incision in plaintiff's left thigh, up near the groin, and from that point followed a blood vessel as close as possible to the point of bleeding and there tied off and ligated that vessel. This procedure failed to control the bleeding and it was discovered that both the big artery and the big vein had been damaged by several punctures or tears. Due to the protracted operative procedure and the great loss of blood, plaintiff was in a critical condition and in a state of shock. Dr. Reardon had undertaken this difficult operation when there was no supervisory surgeon available in the hospital for consultation, advice and aid. Dr. K. S. Grimson, who developed the most extensive operation which might be performed upon the sympathetic nervous system and who was the head of that branch of the surgical service of Duke Hospital, was not available. Dr. Deryl Hart, Chief of the Surgical Service of the hospital, was called from his home in an effort to save the patient's life. Dr. Hart had not undertaken a lumbar sympathectomy in five years.

When Dr. Hart arrived at the hospital, all operative procedure was at a standstill and the bleeding was temporarily controlled by means of a pack. Upon discovering the condition of the patient, Dr. Hart abandoned all efforts to repair the damaged blood vessels and directed all his attention toward saving the patient's life. In this emergency, Dr. Hart, with the aid of Dr. Reardon and his associates, tied off the fibrous tissue which included the torn blood vessels and clipped them *en masse.* With these main vessels severed, the blood supply to that area of patient's body was greatly diminished, and upon reacting from the anesthetic about 9 o'clock that night, plaintiff discovered he was paralyzed from his hips down. The only hope of an adequate blood supply to his lower left leg and thigh was the development of a collateral circulation by means of smaller blood vessels. This collateral circulation did not materialize and as a result, gangrene developed and Dr. Reardon amputated plaintiff's left leg below

the knee.   Because of defects in this amputation, plaintiff suffered and sustained another operation by Dr. Reardon whereby his left leg stump was debrided.   Later, it was necessary for Dr. Hart to reamputate plaintiff's left leg, removing the knee joint.   Plaintiff next developed a myocardial infraction of the heart.   Then, a blood clot in his right leg resulted in gangrene and plaintiff's right leg was amputated by Dr. Hart.   From these operations and the suffering incident thereto, plaintiff acquired a drug habituation.

Excerpts from the pleadings received in evidence tend to show that the plaintiff neither authorized nor consented to the operations performed on him on 13 September, 1947, and that he "did not need or require any operation" at that time.

Plaintiff, for the first operations, was taken to the operating room before 9 o'clock in the morning and remained there until about 4:30 in the afternoon, during which time he was given by transfusions from 14 to 17 pints of blood.   When pressed by plaintiff for an explanation of what happened during the operation, Dr. Reardon gave as his only comment, "I played hell; that is what happened."

Upon admission to the hospital, plaintiff weighed between 180 and 185 pounds.   When discharged on 15 January, 1948, he weighed 94 pounds. Plaintiff was not a charity patient and all expenses of his hospitalization were fully paid.

At the close of plaintiff's evidence, the court overruled the motions of the defendants for judgment as of nonsuit, but such motions at the close of all the evidence were allowed as to both defendants.   From the judgment entered, plaintiff excepted and appealed, assigning errors.

*W. R. Dalton, Sr., D. E. Scarborough, and W. R. Dalton, Jr., for plaintiff, appellant.*

*E. C. Bryson and Fuller, Reade, Umstead & Fuller for defendants, appellees.*

VALENTINE, J.   The decisive question presented by this appeal is whether the evidence sufficeth to take the case to the jury.

Many variations of the rule defining the *quantum* of proof necessary to carry a case to the jury have been evolved through the years.   *Davidson v. Telegraph Co.,* 207 N.C. 790, 178 S.E. 603; *Mitchell v. Saunders,* 219 N.C. 178, 13 S.E. 2d 242; *Stell v. Trust Co.,* 223 N.C. 550, 27 S.E. 2d 524; *Atkins v. Transportation Co.,* 224 N.C. 688, 32 S.E. 2d 209; *Bundy v. Powell,* 229 N.C. 707, 51 S.E. 2d 307; *Potter v. Supply Co.,* 230 N.C. 1, 51 S.E. 2d 908; *Graham v. Gas Co.,* 231 N.C. 680, 58 S.E. 2d 757; *Maddox v. Brown,* 232 N.C. 244, 59 S.E. 2d 791.   But the whole matter distilled and boiled down involves the process of placing all of plaintiff's

evidence and so much of defendant's evidence as is favorable to plaintiff in evenly balanced scales to see if such evidence weighs against nothing, and if, by this procedure, more than a scintilla of evidence favorable to the plaintiff is found, a jury question is presented. *Cox v. R. R.,* 123 N.C. 604, 31 S.E. 848; *Wall v. Bain,* 222 N.C. 375, 23 S.E. 2d 330; *Adcox v. Austin,* 235 N.C. 591. This principle applies with force to the record now under consideration.

It appears from the evidence, including excerpts from the pleadings, that at all times material to this litigation Dr. Reardon was an agent, servant and employee of Duke Hospital and was acting within the scope of his duty as such agent. It follows, therefore, if Dr. Reardon was guilty of actionable negligence, such negligence is imputable to his co-defendant and both are liable.

The plaintiff contends that the evidence supports many inferences of negligence, among which are these:

(a) That Dr. Reardon, without plaintiff's permission, made haste to perform a serious operation without having first obtained a fixed and definite diagnosis, and when there was no necessity for such an operation.

(b) That Dr. Reardon should not have undertaken such a serious operation without first determining that there was available in the hospital a more experienced and capable surgeon upon whom he could call for consultation and aid in case of difficulty.

(c) That Dr. Reardon extended the operative procedure too long and neglected to call for experienced surgical aid when he encountered a situation requiring skill outside the scope of his experience and beyond the range of his training.

(d) That the severe damage done to plaintiff's venal structure by Dr. Reardon resulted in so much loss of blood that Dr. Hart when summoned was unable to repair the damage, but directed his attention immediately toward saving the patient's life, with the result that plaintiff survived but suffered disastrous results.

(e) That Dr. Reardon performed a defective amputation of plaintiff's left leg.

(f) That Dr. Reardon's statement to the plaintiff, "I played hell; that is what happened," indicated a consciousness of carelessness in the performance of the operation.

We are constrained to agree with the plaintiff that whether Dr. Reardon proceeded with that degree of ordinary care required of him under the circumstances and conditions shown by the record was a question of fact for the jury. *Brewer v. Ring and Valk,* 177 N.C. 476, 99 S.E. 358; *Covington v. James,* 214 N.C. 71, 197 S.E. 701; *Butler v. Lupton,* 216 N.C. 653, 6 S.E. 2d 523; *Davis v. Wilmerding,* 222 N.C. 639, 24 S.E. 2d 337.

"The absence of expert medical testimony, disapproving the treatment or lack of it, is not perforce fatal to the case. There are many known and obvious facts in the realm of common knowledge which speak for themselves, sometimes even louder than witnesses, expert or otherwise." *Gray v. Weinstein,* 227 N.C. 463, 42 S.E. 2d 616.

Hospitals and members of the medical profession are held in high esteem and in most cases enjoy the general affection of the public. They are, of course, entitled to every reasonable consideration, but there should not be drawn around them unnatural or artificial immunities to shield them against acts of negligence. They are not guarantors of effective cures or of perfect operative results. Nevertheless, the law of negligence holds a physician or surgeon liable for an injury to a patient proximately resulting from a want of that degree of knowledge and skill ordinarily possessed by other members of his profession, or for a failure to use reasonable care and diligence in the practice of his art, or for his failure to exercise his best judgment in the treatment of his patient. *Nash v. Royster,* 189 N.C. 408, 127 S.E. 356; *Davis v. Wilmerding, supra.* Every negligence case, like the proverbial tub, "must stand on its own bottom."

We, of course, express no opinion as to the truth or falsity of the evidence, but viewing it with that liberality required under the circumstances here presented, we reach the conclusion that the premissible inferences are such as to make the issue of liability one for the jury. Therefore, the judgment of nonsuit must be

Reversed.

JOHNSON, J., concurs in result.