MARGARET HAWKINS v. DR. WALKUP McCAIN.

(Filed 15 January, 1954.)

**1. Evidence § 46c—**

While nonexperts may testify as to a person's physical appearance before and after taking certain medical treatment, they may not testify as to the effect such treatment had upon the patient, since such an opinion must be based upon scientific knowledge pertaining to a particular branch of learning.

**2. Trial § 22a—**

On motion to nonsuit, plaintiff's evidence must be considered in the light most favorable to her.

**3. Trial § 22b—**

Upon motion to nonsuit, defendant's evidence may be considered to the extent that it is not in conflict with plaintiff's evidence, but tends to explain or make clear that which has been offered by plaintiff.

**4. Physicians and Surgeons § 14—**

By undertaking to treat a patient, a physician implies that he has the degree of learning, skill and ability necessary to the practice of his profession which is ordinarily possessed by others similarly situated, that he will exercise reasonable and ordinary care and diligence in the use of his skill and the application of his knowledge to the patient's case, and that he will exert his best judgment in the treatment and care of the case.

**5. Physicians and Surgeons § 18½ —**

In an action for malpractice, the burden is upon plaintiff to prove by the greater weight of the evidence not only that defendant was negligent, but that such negligence was the proximate cause or one of the proximate causes of her injury.

**6. Physicians and Surgeons § 20—Evidence held insufficient to be submitted to jury in this action for malpractice.**

Evidence tending to show that plaintiff was suffering from a malignant and debilitating disease, that thereafter she went to defendant physician for a skin disorder, that he prescribed an arsenic solution, and that after using it for a short time plaintiff's legs became swollen and the side of her face broke out with yellow blisters, for which she went to a hospital for treatment by other physicians, without evidence that the treatment prescribed by defendant was not approved and in use by the medical profession generally in such cases or that defendant did not have the requisite degree of learning or skill or failed to use his best judgment in the treating of the case, together with defendant's evidence that her hospital treatment was for another disease, *is held* insufficient to be submitted to the jury in plaintiff's action for malpractice, there being no evidence that defendant's treatment caused the latter disease or aggravated her condition in respect to her former disease.

**7. Same—**

Where certain treatment is approved and in general use by the medical profession for the treatment of a particular disease the mere fact that the patient has an unfavorable reaction therefrom does not support the application of the doctrine of *res ipsa loquitur.*

**8. Physicians and Surgeons § 14—**

A physician is not a warrantor of cures nor an insurer.

**9. Physicians and Surgeons § 20—**

Upon motion for nonsuit in an action for malpractice, defendant's expert testimony is properly considered to ascertain the nature of the diseases the plaintiff had according to her evidence, both before and after the treatment by defendant.

APPEAL by plaintiff from *Clarkson, Special Judge,* August Term, 1953, of GUILFORD (High Point Division).

Civil action to recover for personal injuries allegedly resulting from the negligence of the defendant in failing to exercise proper medical care and skill in the treatment prescribed by him for a skin disease from which the plaintiff was suffering.

The pertinent allegations in the complaint and the essential averments in the answer thereto, are set out below.

1. In sum and substance the plaintiff alleges in her complaint that the defendant, a practicing physician, was employed to treat her for a skin disease; that after making a perfunctory examination of plaintiff's condition, he prescribed an arsenic solution for her; that she took it according to his instructions for four days, at the end of which time her eyes were swollen and the corners of her mouth were sore; that becoming alarmed over her condition, she again went to the defendant who advised her to continue taking the solution as prescribed; that she followed his advice for five days more, at which time she collapsed; that it was necessary to rush her to a hospital where she was treated by four other physicians, and narrowly escaped death. That by reason of the improper treatment and unskillful and negligent conduct of the defendant in giving her an excessive amount of arsenic, she "has suffered great bodily injury, nervous disorder and mental anguish; has not been able to work and does not expect to be able to work at any time in the future as she has in the past."

2. The defendant in his answer admits that he is a duly licensed physician and authorized to practice medicine in North Carolina. He alleges that he possesses that degree of knowledge of the science of medicine and that degree of skill in the practice of the art of medicine which is required by law. He also avers in his answer that at the time the plaintiff came to his office in September, 1950, she had a history of having received X-ray treatment for chronic Hodgkin's disease, and of having received hospitalization therefor. That upon examination he found that the plaintiff had a skin disease and undertook the care and treatment of said disease. The defendant denies the allegations of negligence, and further alleges that in the use of his skill and the application of his knowledge in the treatment of the plaintiff's condition as he diagnosed it and in the exercise of his best judgment for her treatment and care, he prescribed for her and gave her full instructions with respect to the medicine which he prescribed.

The substance of the plaintiff's testimony is to the effect that prior to August, 1950, she was in good health and had never had to go to bed for any extended period of time; that in August, 1950, she was working at the Dutch Laundry in High Point as a checker, making around $20.00 a week. In August or around the first of September, 1950, she had some sort of skin disorder which was something like ringworm; that it did not bother her in any way but looked bad and she wanted to get rid of it.

That on or about the first of September, 1950, she went to see Dr. McCain, and told him she had heard that he had a light treatment which was good for skin diseases. She stated to him that she wanted these light or heat treatments; they had a discussion about it; that she had known him before. He had given her some tonic shots to build up her blood, maybe three or four years before that time; that the defendant knew her condition relative to Hodgkin's disease. That she had been to Dr. Gray for X-ray treatments prior to September, 1950, for Hodgkin's disease. That Dr. McCain did give her a heat treatment but expressed the opinion that it would do no good. He stated that arsenic was used for the treatment of the skin disease she had and he would give her that to take. He told her how to take the arsenic solution and described the symptoms she might look for if she should get too much. He said to watch for a metallic taste in her mouth and yellow blisters behind her ears, which she never had at any time. That she had the prescription for the arsenic solution, given to her by the defendant, filled at a local drug store. That the defendant told her what dosage to take; that she took the medicine as prescribed for seven days and one dose on the eighth day and quit; that on that day her feet and legs were swollen so bad that she could hardly get her shoes on to go home from work; that after she had taken the prescription for four days she went back to see Dr. McCain because her eyes were swollen and each corner of her mouth was broken out. She asked him if he thought it was the arsenic causing that and he said no, and told her to continue to take the prescription as directed. On the eighth day she was sick on her stomach. The next morning she was hardly able to go but went to the grocery store and returned home and went to bed and continued to get worse. That on the ninth day she was swollen very bad and the whole side of her face was broken out with yellow blisters. Dr. Grayson, her regular family physician (who has since died), was called. He treated her over a period of about four weeks. She went to the hospital about the fourth or fifth week after she started taking the arsenic solution and stayed three or four days. That she had not been able to work at the Dutch Laundry and cannot do her housework like she formerly did but that she tries to do it. That in September, 1950, she weighed 137 pounds and during the next sixteen weeks she lost 40 pounds and weighed only 98 pounds at the time of the trial. That about three weeks after she started taking the arsenic, Dr. McCain visited her in her home; that he said: "You don't care very much about yourself. You have been laying out here without medical attention." She said: "I have had medical attention." She informed him that Dr. Grayson had been attending her. He then said: "Well, I think you ought to give me a chance to right my wrong." That she did not send for Dr. McCain because she did not want any more of his treatment.

On cross-examination, the plaintiff testified that she had previously gone to Dr. Parks, a skin specialist, and he had given her one heat treatment for the skin condition on her legs and had given her a prescription; that she did not continue his prescription because it caused her so much pain when she put the ointment on her legs she could not stand it; that when she went to the hospital in October, Dr. McCain treated her. That Dr. Leath examined her before she went to the hospital; that Dr. Gray treated her in the hospital, but it was another hospital from that in which Dr. McCain treated her.

The plaintiff also testified that she had had Hodgkin's disease for quite a while, since about 1945; that she thought it was a right serious disease. That when she testified to the jury that she had never had a serious illness, she meant other than Hodgkin's disease. That Dr. Gray had treated her for the results of Hodgkin's disease off and on from 1945, and that he had treated her fairly recently since 1950. From time to time she had been under the care of other doctors, including Dr. Childs at Jamestown, for indigestion, and Dr. Parks, for her skin disease; that she didn't recall any other doctors except Dr. Grayson, Dr. Leath, Dr. Phillip Davis, Dr. Gray, and Dr. McCain. That Dr. Grayson gave her injections of "tonic shots" several years before she had this trouble. She testified, "I don't recall exactly when I entered the hospital, but it was on the 9th or 10th of October, I believe. The next time Dr. McCain was called was about three or four or five days before I entered the hospital. In the meantime I had been treated by Dr. Grayson and I took his medicine. I was admitted to the hospital for herpes zoster and they said it was herpes which was circling my eye. When Dr. McCain saw it he did not say that in his opinion it was not caused by arsenic. He stated, 'I won't say it is caused by the arsenic and I won't say it is not.' "

The plaintiff offered as witnesses in her behalf several of her neighbors, her son-in-law, and her husband, all of whom testified to the change in her appearance after she took the arsenic. Her husband testified that he took his wife to see Dr. McCain on the fourth day after she began to take the arsenic; that he noticed a little puffiness around her eyes; that later he took her to see Dr. Leath about her eye and then to the hospital where Dr. Gray saw her; that Dr. McCain arranged for a room at the old hospital and she was carried there where she remained for about four days.

The defendant testified that the plaintiff came to see him around the first of September, 1950; that "she had psoriasis, big . . . rough scales on her legs and arms, the exposed surfaces. In nonmedical language, psoriasis is a chronic skin disease. The cause is unknown and the cure is unknown. It will improve with certain drugs, arsenic, and some ultraviolet lights and going to the seashore sometimes will help it, but you cannot promise one it will ever be well." That he prescribed for Mrs.

Hawkins two drams of Fowler's solution which contains arsenic, and according to practically all authorities is the best treatment in small doses for the skin disease she had. That the prescription called for one dose of two drops before each meal to be increased one drop a day, that would be six drops for the first day, seven the second day, eight the third day, and so on. That he told her what symptoms to look for, and any time symptoms arose to stop it and see him. That he did not see Mrs. Hawkins again until October 4th or 5th. Her husband came by his office and said his wife's eye was bad. He immediately went to see her. He examined her and found she had a very definite herpes of her right frontal forehead, and her eye was badly swollen. She was very sick. That he did not think there is any relationship between psoriasis and herpes. They are different diseases or conditions of the skin. That he sent her to Dr. Leath's office and then to Dr. Gray. Thereafter he sent her to the Guilford General Hospital where she remained for four days and was treated for herpes zoster. He denied making any statement to her about righting any wrong and also testified that he had no recollection or record of a visit to his office by the plaintiff on the fourth day after he prescribed for her.

Dr. C. L. Gray, an admitted expert physician, surgeon, and radiologist, a witness for the defendant, testified that he knew the plaintiff, Mrs. Hawkins; that he saw her in April, 1945. He examined her at that time and diagnosed her condition. On her initial introduction to him, she made the statement that she had Hodgkin's disease and had been treated previously, about a year or two before by another physician in Greensboro, who was at that time in the Armed Services. "At the time I saw her, she was rather pale and anemic. She had enlarged swollen glands in her neck. On X-ray examination of the chest, there were large lymph nodes or large glands on either side of the heart and a good portion of the chest, all of which is perfectly characteristic of Hodgkin's disease. That was my diagnosis. Hodgkin's disease is a disease of unknown cause; it is a malignant disease, one of the most malignant diseases of what we call the lymph system, the glands in the body, characterized by enlargement of these glands, frequent loss of weight, loss of appetite, anemia, easy fatigue, and characterized also by periods with proper treatment of remissions where these people feel perfectly well and are able to resume their work. At other periods, there is a recurrence of this difficulty and they begin to go downhill again. It is characterized in that manner throughout the rest of that patient's life. The ultimate outcome is not good. That is the condition that Mrs. Hawkins has now. It is a disease that is known to be incurable. When I first examined Mrs. Hawkins, I don't recall that she did have any skin eruptions. About 1949 or 1950, I did notice a skin rash; it was mostly about the hands, the legs, the elbows,

the exposed portions of the body, the knees . . . I was not treating her for that particular condition, but I did notice it. It is not uncommon to have skin disorders with Hodgkin's disease. It might not be this particular one, but skin changes are characteristic of Hodgkin's disease. I saw Mrs. Hawkins in 1950 on three occasions: October 9, 10, and 11, . . . I was asked to see Mrs. Hawkins . . . because of this herpes or shingles that involved the right side of the face, forehead and under the eye. The skin manifestation was characterized by a rather large, fiery, red blister formation, characteristic of that disease, and I was asked to see her in regard to giving her X-ray treatments for that particular disorder. I did administer three treatments for her. She was not in our hospital at that time; she came back and forth. . . . We are never certain of the cause of herpes because herpes zoster may appear as a primary infection in some individuals who otherwise seem well, and it may also appear in people who have chronic diseases or current diseases with what we speak of as poor resistance, . . . Hodgkin's disease is a debilitating disease; it is one such as patients have who frequently have shingles. Shingles does appear in debilitating diseases quite frequently . . . Patients do have herpes zoster who have not taken arsenic. All patients who take arsenic in small or even large doses do not have herpes zoster, or shingles. . . . The loss of weight is one of the characteristics of Hodgkin's disease. The plaintiff's progress with suffering from Hodgkin's disease has been rather characteristic with one exception. . . . Mrs. Hawkins has lived longer than any patient I have even seen with Hodgkin's disease. . . . When I attended Mrs. Hawkins on October 9, 10 and 11, she was in bad physical condition. That condition was caused in part by the shingles. I think it affected her nervous system to a great extent. I am unable to say whether it is still affecting her; it could. Mrs. Hawkins is obviously pale now and has lost considerable amount of weight since I last saw her . . ."

Dr. Phillip B. Davis, a witness for the defendant and admitted to be a medical expert, testified that he did not see the plaintiff, Mrs. Hawkins, until a year after the time Dr. McCain treated her. He treated her in 1951 for anemia as a result of Hodgkin's disease. This witness further testified, "The causes of herpes zoster are unknown. . . . You see herpes most often in those individuals with long, debilitating diseases, that is, herpes zoster. . . . As a rule Hodgkin's disease is a long and debilitating disease. Hodgkin's disease is classified among the blood diseases, that is the lymphatic system, where you have a change in the lymph glands. It is a debilitating condition manifested by anemia to such a marked degree that the patient usually expires from weakness. We feel very fortunate . . . when we find a patient who has lived two to five years after the inception of the disease."

The defendant moved for judgment as of nonsuit at the close of the plaintiff's evidence, the motion was denied. It was renewed at the close of all the evidence and allowed. The plaintiff appeals, assigning error.

*J. V. Morgan for appellant.*
*Smith, Sapp, Moore & Smith for appellee.*

DENNY, J. Assignments of error Nos. 1, 2, 3, 4, and 6 are based on like numbered exceptions to the exclusion of evidence by nonexpert witnesses as to what advice they gave the plaintiff upon observing her condition, and the reason for offering such advice. These witnesses were permitted to testify as to the plaintiff's physical appearance before she took the Fowler's solution, as well as during the time she was taking it and immediately thereafter. However, the court sustained the defendant's objections to their proposals to testify that they advised her to stop taking the medicine "because it seemed to be killing her."

In cases where the physician's or surgeon's want of skill or lack of care is so gross or patent as to be within the comprehension of laymen and to require only common knowledge and experience to understand and judge it, expert evidence is not required. *Jackson v. Sanitarium,* 234 N.C. 222, 67 S.E. 2d 57; *Wilson v. Hospital,* 232 N.C. 362, 61 S.E. 2d 102; *Gray v. Weinstein,* 227 N.C. 463, 42 S.E. 2d 616; *Groce v. Myers,* 224 N.C. 165, 29 S.E. 2d 553; *Covington v. James,* 214 N.C. 71, 197 S.E. 701. But in other factual situations the rule is different as pointed out by *Justice Seawell* in *Groce v. Myers, supra,* in which he said: "In cases involving the application of scientific knowledge peculiar to that branch of learning (the science of medicine), there is no question that the rules of evidence requiring expert opinion in matters of scientific knowledge ought to be carefully enforced, both in the interest of justice and in the protection of a profession peculiarly liable to suit when, after exhausting every known resource and applying the highest degree of skill, the result is not what the patient or friends desire or hoped for."

The court below properly excluded the above testimony. It constituted nothing more than mere conjecture or surmise on the part of these lay witnesses as to cause and effect in a field of knowledge in which only an expert could give a competent opinion, *Jackson v. Sanitarium, supra,* that is, one as to whether the health of the plaintiff had been injuriously affected by taking the prescribed medicine.

The plaintiff also assigns as error the exclusion of other proffered testimony. But a careful examination of the exceptions upon which these assignments of error are based discloses that they are without merit. Hence, they are overruled.

Assignment of error No. 10 is based on an exception to the ruling of the trial court in sustaining the defendant's motion for judgment as of nonsuit. Therefore, we must determine whether or not the plaintiff's evidence, when considered in the light most favorable to her, as it must be on such motion, *Chambers v. Allen,* 233 N.C. 195, 63 S.E. 2d 212; *Winfield v. Smith,* 230 N.C 392, 53 S.E. 2d 251, is sufficient to warrant its submission to the jury. In our opinion it is not.

In arriving at this conclusion we are advertent to the rule that we are not permitted to consider the defendant's evidence, unless it is favorable to the plaintiff, except when it is not in conflict with plaintiff's evidence, it may be used to explain or make clear that which has been offered by the plaintiff. *Nance v. Hitch,* 238 N.C. 1, 76 S.E. 2d 461; *Rice v. Lumberton,* 235 N.C. 227, 69 S.E. 2d 543, and cited cases.

The duty of a physician to his patient was set forth in the case of *Nash v. Royster,* 189 N.C. 408, 127 S.E. 356, by the late *Chief Justice Stacy* in the following language: "Ordinarily, when a physician or surgeon undertakes to treat a patient without any special arrangement or agreement, his engagement implies three things: (1) that he possesses the requisite degree of learning, skill and ability necessary to the practice of his profession, and which others similarly situated ordinarily possess; (2) that he will exercise reasonable and ordinary care and diligence in the use of his skill and in the application of his knowledge to the patient's case; and (3) that he will exert his best judgment in the treatment and care of the case entrusted to him," citing numerous authorities. See *Nance v. Hitch, supra; Jackson v. Joyner,* 236 N.C. 259, 72 S.E. 2d 589; *Waynick v. Reardon,* 236 N.C. 116, 72 S.E. 2d 4; *Jackson v. Sanitarium, supra; Wilson v. Hospital, supra; Grier v. Phillips,* 230 N.C 672, 55 S.E. 2d 485; *Buckner v. Wheeldon,* 225 N.C. 62, 33 S.E. 2d 480.

The plaintiff alleges in her complaint that she has suffered great bodily injury, nervous disorder and mental anguish resulting from the defendant's want of skill, his improper treatment and his failure to use and apply such skill and care as should have been applied in the ordinary course of treatment for her condition.

In an action for malpractice, the burden is upon the plaintiff to prove by the greater weight of the evidence not only that the defendant was negligent, but that such negligence was the proximate cause or one of the proximate causes of her injury. *Grier v. Phillips, supra; Smith v. Wharton,* 199 N.C. 246, 154 S.E. 12.

An examination of the plaintiff's evidence discloses that she employed the defendant on or about 1 September, 1950, to treat her for a skin disease; that she has been a victim of Hodgkin's disease since 1945; that after she took the Fowler's solution for seven days and one dose on the eighth day, she discontinued taking it. That after she began to take

Fowler's solution that contained arsenic, her legs began to swell and her face was puffed around her eyes; that on the ninth day after she started taking Fowler's solution the whole side of her face was broken out with yellow blisters. She called her regular family physician, Dr. Grayson, who treated her over a period of four weeks. Thereafter, her husband called the defendant who went to see her at her home and found she was suffering from herpes zoster; that she went to the hospital on the 9th or 10th of October, where the defendant treated her; that in the meantime Dr. Leath treated her eye and Dr. Gray also treated her for herpes zoster; that when she was admitted to the hospital she was informed that "it was herpes which was circling my eye."

It is significant that the plaintiff offered no evidence in support of her allegations with respect to the defendant's want of skill and that he prescribed the wrong treatment for her condition. There is no allegation or evidence to the effect that the defendant did not use his best judgment in treating the plaintiff. There is no evidence as to what Dr. Grayson, her family physician, treated her for or what medicine he gave her. Neither is there any evidence that she ever informed Dr. Grayson, Dr. Leath or Dr. Gray that she had taken Fowler's solution. In so far as the plaintiff's evidence is concerned, the treatment prescribed by the defendant may have been the one overwhelmingly approved and used by the medical profession generally in such cases. Furthermore, if it was an approved and acceptable treatment and the dosages as prescribed proper, the mere fact that she had an unfavorable reaction from its use would not make the doctrine of *res ipsa loquitur* applicable, nor would it be sufficient to establish actionable negligence against the defendant. *Springs v. Doll,* 197 N.C. 240, 148 S.E. 251; *Smith v. McClung,* 201 N.C. 648, 161 S.E. 91; *Byrd v. Hospital,* 202 N.C. 337, 162 S.E. 738. As stated by *Barnhill, J.,* in *Lippard v. Johnson,* 215 N.C. 384, 1 S.E. 2d 889: "Practical application of the medical science is necessarily to a large degree experimental. Due to the varying conditions of human systems the result of the use of any medicine cannot be predicted with certainty. What is beneficial to many sometimes proves to be highly injurious to others." Moreover, a physician is not "a warrantor of cures nor an insurer." *Pendergraft v. Royster,* 203 N.C. 384, 166 S.E. 285.

It is permissible for us to examine the defendant's evidence in order to ascertain the nature of the diseases the plaintiff had, according to her evidence, at the time the defendant prescribed for her and at the time she entered the hospital more than a month thereafter. It will be noted that there is a considerable variance between the allegations of the complaint and the plaintiff's evidence as to the time she was hospitalized.

The defendant testified that when he prescribed for her she had psoriasis, which is a chronic skin disease; that its cause is not known and there

is no known cure for it; that it will improve in response to certain treatments.

Dr. Gray testified that Hodgkin's disease is a disease of unknown cause; that it is malignant, one of the most malignant diseases of the lymph system, the glands of the body, characterized by the enlargement of these glands, frequent loss of weight, loss of appetite, anemia, and easy fatigue; it is incurable. This witness further testified that "we are never certain of the cause of herpes because herpes zoster may appear as a primary infection in some individuals who otherwise seem well, and it may also appear in people who have chronic diseases or current diseases . . . Hodgkin's disease is a debilitating disease; it is one such as patients have who frequently have shingles." Therefore, it is not established by the plaintiff's evidence or by the evidence of the defendant favorable to her, that the treatment prescribed for her by the defendant caused the herpes zoster or aggravated her condition with respect to Hodgkin's disease.

In our opinion, the evidence disclosed on this record does not establish actionable negligence against the defendant. *Boger v. Ader,* 222 N.C. 758, 23 S.E. 2d 852; *Lippard v. Johnson, supra; Ferguson v. Glenn,* 201 N.C. 128, 159 S.E. 5.

For the reasons stated, the judgment of the court below is

Affirmed.