Emma Jean BROWN, Executrix of the Estate of George R. Brown, Deceased, Plaintiff,

v.

Martha R. MOORE, William W. Richardson, Jr., Julia R. Corbin and Robert R. Richardson, Defendants,

William R. INGRAHAM, Third-Party Defendant.

Civ. A. No. 9080.

United States District Court
W. D. Pennsylvania.

Aug. 9, 1956.

Edward O. Spotts, Jr., Theodore M. Tracy, Pittsburgh, Pa., Melvin Belli, San Francisco, Cal., for plaintiff.

Harold E. McCamey, of Dickie, Mc-Camey, Chilcote, Reif & Robinson, Pittsburgh, Pa., for defendants.

Milton W. Lamproplos, of Smith, Burchanan, Ingersoll, Rodewald & Eckert, Pittsburgh, Pa., for third-party defendant.

MARSH, District Judge.

The trial in this case resulted in verdicts of $35,000 in the survival action and $25,000 in the wrongful death action. Motions were made to enter judgment for defendants and third-party defendant in accordance with their motions for a directed verdict, on which judgment was reserved; or in the alternative to grant a new trial, or dismiss the action for lack of jurisdiction.

The motions contained reasons which can be classified as follows:

(1) denial of liability for malpractice of a physician in the exercise of professional services;

(2) denial that the owners of a private sanitarium had a non-delegable duty to provide proper medical care and treatment to a patient;

(3) the court lacked jurisdiction;

(4) the evidence was insufficient;

(5) the verdicts were excessive.

It is the opinion of the court that the motion for a directed verdict should have been granted, and the motion for a new trial should be denied.

The defendants, together with the third-party defendant, were the owners of Mercer Sanitarium at Mercer, Pennsylvania, which they conducted for profit. This institution accepted for treatment patients afflicted with mental and nervous diseases. The third-party defendant was the business manager, and the only owner residing at the Sanitarium during the period pertinent to this case. The defendants resided in foreign states; one was a medical doctor.

On September 5, 1949, George R. Brown, the plaintiff's decedent, was admitted to the Sanitarium by Dr. John L. Kelly,[1] the medical director, as a patient for treatment of an anxiety neurosis. The verdict establishes that on September 13, 1949, he died as a result of malpractice on the part of Dr. Kelly.[2]

The jury could have found that several hours after an electro-shock treatment, Brown was negligently permitted to walk about unaccompanied and fell down a flight of steps, breaking his neck; that the doctor negligently diagnosed his condition as hysteria and treated him accordingly; and that the negligence was the proximate cause of Brown's death.

The undisputed evidence produced on behalf of plaintiff disclosed that the owners employed Dr. Kelly, a licensed medical doctor, registered nurses, practical nurses and nurses aids. The doctor was given a residence on the grounds and partial maintenance; he was paid an annual salary, subject to the usual withholding deductions. The doctor had broad managerial powers over the medical facilities, nursing personnel, diagnoses and treatment of patients. He was permitted to engage in private practice, but the Sanitarium had first call on his time twenty-four hours a day.

Prior to September 5th, Mr. Brown had undergone treatment at two Pittsburgh hospitals in the service of his family doctor. The latter referred him to Mercer Sanitarium, but neither he nor Mr. and Mrs. Brown were acquainted with Dr. Kelly who was its only physician at that time. The Browns met Dr. Kelly in his office at the Sanitarium when he admitted Mr. Brown as a patient. There they signed an admission card giving "The Mercer Sanitarium permission to administer any form of recognized medical treatment, including Electro-Shock Therapy, to George R. Brown which is deemed advisable by the Medical Staff of said Sanitarium, and does hereby release The Mercer Sanitarium and its employees from any damages on this account." Mrs. Brown, the plaintiff, also agreed "to indemnify The Mercer Sanitarium for any loss resulting from injury to or injury or damage caused by George R. Brown while a patient of Dr. J. L. Kelly and the said Sanitarium herein mentioned."

The plaintiff submitted her case of liability on the theory that a private sanitarium conducted for profit is liable for the torts of its hired physician and nurses in performing medical and professional services for Mr. Brown pursuant to the doctrine of respondeat superior. She relied on one Pennsylvania case decided by a court of common pleas in 1931, Ulbrich v. Boone County Coal Corp., 16 Pa.Dist. & Co. 315, and cases from several foreign jurisdictions.[3]

1. The original defendants attempted to bring upon the record as a third-party defendant Dr. John L. Kelly, but the process was returned N.E.I.

2. Plaintiff entered suit against Dr. Kelly and the owners in the Common Pleas Court of Mercer County, Pennsylvania, and subsequently filed this action in the federal court. Although unable to obtain jurisdiction in the federal action over Dr. Kelly, who was then a citizen of Pennsylvania, Brown v. Ingraham, D.C.W.D.Pa.1951, 11 F.R.D. 522, plaintiff nonetheless pressed for trial of this action first. At the owners' request, a stay was granted in order that the state court could first dispose of the matter; when it appeared that an impasse had developed in the state court action, the stay was lifted.

3. Garfield Memorial Hospital v. Marshall (Marshall v. O'Donnell), 1953, 92 U.S. App.D.C. 234, 204 F.2d 721, 37 A.L.R.2d 1270; Waynick v. Reardon, 1952, 236

The facts relating to the employment of Dr. Kelly were proved by plaintiff and are not in dispute. The malpractice proved involved medical or professional skill and learning as distinguished from routine hospital duties directed administratively.[4]

It seems that the negligent performance of routine matters such as those mentioned in footnote 4 renders a private employer liable, because he retains the right to direct not only the manner in which the work is to be done but also the specific result to be accomplished. In those cases the technical employees, whether doctors or nurses, were hired to exercise their peculiar skill and technical knowledge to perform certain acts, and to produce certain definite and specific results which are known in advance of employment. Similar reasoning forms the basis for liability of masters who employ technicians such as pilots, chauffeurs, engineers and the like. Utterly dissimilar is the negligence occurring in the course of treatment where medical and professional services by doctors and nurses are required and over which the employer not only has no control, actual or potential, over either the result to be accomplished or how it is to be accomplished, but, indeed, such control is forbidden by law.[5] In such circumstances, physicians and trained nurses exercise their own undirected judgment and discretion and act as independent contractors. Cf. Mraceck v. Sunshine Biscuit, Inc., 1954, 308 N.Y. 116, 123 N.E.2d 801; Runyan v. Goodrum, 1921, 147 Ark. 481, 228 S.W. 397, 13 A.L.R. 1403; Restatement, Agency, § 223, comment (a), (b).

■ Although no Pennsylvania case in point has been brought to our attention, except perhaps the Ulbrich case, it is fundamental in Pennsylvania that a principal cannot be held liable unless he is the master of the negligent party and as such controls or has the right to control the conduct of his servant. Control or potential control over the servant seems to be the essence of liability. Silveus v. Grossman, 1932, 307 Pa. 272, 161 A. 362.[6,7]

N.C. 116, 72 S.E.2d 4; Treptau v. Behrens SPA, Inc., 1945, 247 Wis. 438, 20 N.W.2d 108; Hedlund v. Sutter Medical Service Co., 1942, 51 Cal.App.2d 327, 124 P.2d 878; Edwards v. West Texas Hospital, Tex.Civ.App.1936, 89 S.W.2d 801; Gilstrap v. Osteopathic Sanatorium Co., 1929, 224 Mo.App. 798, 24 S.W.2d 249; Vaughan v. Memorial Hospital, 1925, 100 W.Va. 290, 130 S.E. 481; Jenkins v. Charleston General Hospital & Training School, 1922, 90 W.Va. 230, 110 S.E. 560, 22 A.L.R. 323; Brown v. La Société Francaise De Bienfaisance Mutuelle, 1903, 138 Cal. 475, 71 P. 516.

4. Examples of routine acts directed administratively are: negligent withdrawal of blood, Mrachek v. Sunshine Biscuit, Inc., 1954, 308 N.Y. 116, 123 N.E.2d 801; failure to call physician during mother's labor, Garfield Memorial Hospital v. Marshall (Marshall v. O'Donnell), supra; negligent placing of infant in bassinet, Durney v. St. Francis Hospital, Inc., 1951, 7 Terry 350, 46 Del. 350, 83 A.2d 753; negligent application of hot water bottle, Stuart Circle Hospital Corp. v. Curry, 1939, 173 Va. 136, 3 S.E.2d 153, 124 A.L.R. 176; negligent administration of hypodermic, Malcolm v. Evangelical Lutheran Hospital Ass'n of York, Seward, Hamilton and other Counties, 1921, 107 Neb. 101, 185 N.W. 330; defective windows causing pneumonia and death, Bailey v. Long, 1916, 172 N.C. 661, 90 S.E. 809, L.R.A.1917B, 708; mistake in administering drugs, Stanley v. Schumpert, 1906, 117 La. 255, 41 So. 565, 6 L.R.A.,N.S., 306.

5. Act 1911, June 3, P.L. 639 et seq., as amended 1941, Aug. 6, P.L. 903, Tit. 63 P.S.Pa. §§ 401, 401a et seq.; Act 1927, May 13, P.L. 988, §§ 9, 10, Tit. 63 P.S. Pa. §§ 208, 209; these Acts prohibit the practice of medicine and professional nursing by laymen and unlicensed doctors and nurses.

6. In certain circumstances physicians may have the right to control the professional work of other physicians and nurses and thus may be liable for their torts. See: Shull v. Schwartz, 1950, 364 Pa. 554, 73 A.2d 402; McConnell v. Williams, 1949, 361 Pa. 355, 65 A.2d 243.

7. It does not appear that the defendant, William W. Richardson, Jr., a doctor (T., p. 336), was licensed to practice medicine in Pennsylvania or had any right to exercise control over Dr. Kelly (T., p. 42).

The applicable Pennsylvania rules appear at page 638 in Joseph v. United Workers Ass'n, 1942, 343 Pa. 636, 23 A.2d 470, 472, with which the Restatement, Agency, § 220 [8] is in accord:

" ' "A master is one who stands to another in such a relation that he not only controls the results of the work of that other, but also may direct the manner in which such work shall be done." "A servant is one who is employed to render personal services to his employer otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter." "The relation of master and servant exists where the employer has the right to select the employe, the power to remove and discharge him, and the right to direct both, what work shall be done, and the way and manner in which it shall be done" '. McColligan v. Pennsylvania R. Co., 214 Pa. 229, 232, 63 A. 792, 793, 6 L.R.A.,N.S., 544, 112 Am.St.Rep. 739. ' "It is essential to the relation of employer and employee * * * that the employer shall have power and authority to direct and control the acts of the alleged employee. Having this power the employer must respond; lacking it he is not to be held accountable. Respondeat superior is the foundation of liability; and if the employer or principal is without power to command or direct the acts of the alleged employee or agent, there is no superior whose duty it is to respond for the acts of an inferior" '. Eckert v. Merchants' Shipbuilding Corp., 280 Pa. 340, 349, 124 A. 477, 481. See also Cox v. Roehler, 316 Pa. 417, 419, 175 A. 417; Tyler v. MacFadden Newspapers Corp., 107 Pa.Super. 166, 171, 163 A. 79; Restatement, Agency, Section 220. * * * 'The very phrase "independent contractor" implies that the contractor is independent in the manner of doing the work contracted for'. Silveus v. Grossman, 307 Pa. 272, 278, 161 A. 362, 364. See also Colleoni v. Delaware & Hudson Co., 274 Pa. 319, 323, 118 A. 248; Fuller v. Palazzolo, 329 Pa. 93, 105, 197 A. 225; Tyler v. MacFadden Newspapers Corp., supra, 107 Pa.Super. [at] page 172, 163 A. 79; Restatement, Agency, Section 2.

"Under all the decisions, the basic inquiry, in ascertaining the character of the relationship, is as to whether the alleged servant is subject to the alleged master's control or right to control with respect to his physical conduct in the performance of the services for which he was employed. As was said in Eckert v. Merchants' Shipbuilding Corp., supra, 280 Pa. [at] page 349, 124 A. [at] page 480: 'All other elements, "even those which are normal and customary incidents of contracts of service are, in an evidential point of view, material only in so far as they may tend more or less strongly, under the given circumstances, to show that the alleged master exercised control over the alleged servant" ' ".

Dr. Kelly, hired by the owners and placed in charge of diagnoses and treatment of patients was engaged as a skilled professional man on the understanding that he was to function according to his own personal judgment, learning and skill. The owners undertook " 'not to heal or attempt to heal through the agency of others, but merely to supply others who will heal or attempt to heal on their own responsibility' ". Shearman & Redfield on Negligence, rev. ed., vol. 4, page 1584; 19 A.L.R. 1183. On like principles trained nurses in the

---

8. Illustration 4 under § 220 states:
"P, a hospital, employs a house surgeon, putting him in charge of all operations within the hospital, except where patients require another surgeon. The inference is that the house surgeon is not the servant of the hospital in the conduct of surgical operations."

exercise of professional services would be acting as independent contractors. Shearman & Redfield on Negligence, rev. ed., vol. 4, pp. 1584–5; 19 A.L.R. 1189.

Since it was not shown at the trial that the owners had any control or right to control Dr. Kelly in his diagnosis and professional treatment of Mr. Brown, the court was and still is of the opinion that he was acting as an independent contractor.

Notwithstanding this conclusion, at the close of plaintiff's evidence, motions to dismiss were refused. At that time it seemed right and just to hold as a matter of law that the owners had impliedly agreed to properly treat and care for Mr. Brown, and that a hospital-patient relationship had been established between them. We thought from this implied agreement and the relationship that a non-delegable duty arose to properly treat and care for Mr. Brown, and that a tortious breach thereof by the owners' hired physician would cast vicarious liability upon them. Cf. Prosser, Law of Torts, 2d ed. (1955), § 64, p. 359. See cases cited by plaintiff in footnote 3. If such were the case the liability would be cast upon them by law and not by contract. Cf. Paterlini v. Memorial Hospital Ass'n of Monongahela City, 3 Cir., 1918, 247 F. 639, 644.

■ We were also impressed by the language in the Restatement, Agency § 214, where in comment (a) to § 214 it is stated:

"Thirdly, one may have a duty to see that due care is used in the protection of another, a duty which is not satisfied by using care to delegate its performance to another but is satisfied if, and only if, the person to whom the work of protection is delegated is careful in giving the protection."

Since the trial we have considered Pennsylvania cases such as Philadelphia, W. & B. Ry. Co. v. Hahn, 1888, 9 Sadler 364, 12 A. 479 and Lancaster Ave. Improvement Co. v. Rhoads, 1887, 116 Pa. 377, 9 A. 852, wherein liability for negligence of an independent contractor was upheld on the theory that the duties arising were non-delegable.

■ However, after considering "all the available data", which is the duty of a federal court when no conclusive state authority is found upon the precise question before it, Stentor Electric Mfg. Co., Inc., v. Klaxon Co., 3 Cir., 1942, 125 F.2d 820, 824, it is our opinion that the law of Pennsylvania does not presently cast a non-delegable duty to care for and treat patients upon the owners of a private sanitarium for profit.

Cases such as Silveus v. Grossman, supra, and Anderson v. Hays Mfg. Co., 1903, 207 Pa. 106, 56 A. 345, 63 L.R.A. 540, indicate strongly that the appellate courts of Pennsylvania are extremely reluctant to extend the doctrine of non-delegable duty to liability for "negligence beyond the point where personal supervision and judgment must, in the very nature of the case, end." 56 A. at page 348. See also Pennsylvania Annotations to the Restatement, Torts §§ 409, 416, 417, 422, 423, 427, where it appears that the Pennsylvania cases are contra to the rules subjecting principals to liability for harm caused by independent contractors. See also Baier v. Glen Alden Coal Co., 1938, 131 Pa.Super. 309, 200 A. 190.

■ Beyond dispute, as far as the evidence goes, the owners here did employ a competent licensed physician and competent nurses, and it was their duty to see that their doctor and nurses treated and cared for their patients, but beyond that they could not go since they did not have the required professional licenses, nor a personal duty to exercise professional knowledge and skill.

These owners did not have a duty to do that which the law forbade. Their duty was to provide a hospital and a competent medical staff where persons could be treated for nervous diseases. They could not engage in the practice of medicine by employing a licensed physician. Their professional staff could not accept from them directions or

instructions in diagnoses or professional care and treatment.

It is clear that the defendants, not being licensed in Pennsylvania, could not have treated Brown for his neurosis, prescribed for him, diagnosed his injuries after his fall down the stairs, or treated him professionally for the injuries he received. Indeed, it would have been unlawful and reckless on their part if they had attempted to perform these functions.

■ Plaintiff relied at the trial on Ulbrich v. Boone County Coal Corp., supra. That case either represents a view contrary to that which we conceive to be the law of Pennsylvania,[9] or is justified for reasons of public policy springing from an express industrial contract obligating an employer to provide medical care for his employees.[10]

■ In her brief, plaintiff relies on § 429 of the Restatement, Torts.[11] No Pennsylvania cases are cited in support of that section. That section was not mentioned at the trial and the principle of liability for which it stands was not applied. Notwithstanding, in reliance thereon, plaintiff now contends that although Dr. Kelly is held to be an independent contractor, the owners are liable as a matter of law for his torts since the Browns accepted his services in the reasonable belief that those services were being rendered by the owners or their servants. But we think as a matter of law, in view of the statutes prohibiting the practice of medicine in Pennsylvania without a license,[12] the Browns could not have accepted the professional medical services of Dr. Kelly in the reasonable belief that he, while rendering such, was a servant of the owners.

For the foregoing reasons we think the judgments entered on the verdicts should be set aside and judgment entered in accordance with the motions for directed verdict.

■ The owners also contend that plaintiff shifted her ground from a tort action to a contract action. They say the record shows them to be partners. They argue that contractual liability of partners being joint,[13] they are indispensable parties to a contract action;[14] that since one of the partners, William R. Ingraham, is a citizen of Pennsylvania, as is plaintiff, the jurisdiction of this federal court is destroyed.

With this defense we do not agree. The action against defendants is plainly based on negligence, sounds in tort, and accrued when the injury resulted from the doctor's malpractice. Whenever the tort consists of a violation of a duty which springs from a contract between the parties, the principal may be liable in an action ex delicto. As the skillful counsel for plaintiff so cogently expressed it: "The contract puts them [the partners] in the position so that the tort may be committed." Cf. 70 C. J.S., Physicians and Surgeons, § 57; Hoehle v. Allegheny Heating Co., 1897, 5 Pa.Super. 21.

■ The court is also required to rule on the motion for a new trial. Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 61 S.Ct. 189, 85 L. Ed. 147. On this phase we think the evidence was sufficient to support a find-

---

9. Although a federal court in a diversity case sits, in effect, as another state court, Angel v. Bullington, 330 U.S. 183, 67 S. Ct. 657, 91 L.Ed. 832, it is not bound to follow one common pleas court decision. Eckman v. Baker, 3 Cir., 1955, 224 F.2d 954.

10. See 26 Am.Juris., Hospitals and Asylums, § 15; 29 A.L.R. 742.

11. "One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for bodily harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants."

12. See footnote 5.

13. Uniform Partnership Act, § 15(b), Act 1915, March 26, P.L. 18, Part III, Title 59 P.S.Pa. § 37(b).

14. Rule 19(a), Fed.R.Civ.P. 28 U.S.C.

ing that the physician and the nurses acting under his direction were guilty of malpractice.

Briefly stated, the evidence is that on the morning of September 9th, between 8:00 and 9:00 o'clock, Dr. Kelly gave Brown an electro-shock treatment producing a grand mal reaction. After the shock, he slept, ate, bathed, read, and at about 3:00 o'clock P.M., walked upstairs to the second floor for a massage. About twenty minutes later, he was permitted to return unattended to the first floor. He fell down a flight of stairs, eighteen in number. The fall was unobserved. He immediately complained that his neck was broken and that he was dying. He could not explain what caused his fall. Dr. Kelly was summoned.

There was testimony that persons who have experienced grand mal reactions from shock treatments are mentally confused and their muscles are not co-ordinated for varying periods of time, and that they should be carefully watched. Apparently Dr. Kelly did not consider it necessary to have an attendant accompany Mr. Brown as he walked about the Sanitarium approximately seven hours after the treatment. The fact that after the fall he was conscious and complaining, but could not account for the cause of his fall, is a strong circumstance that he was still in a confused and inco-ordinated state. Thus the jury might have inferred from the circumstances that it was not only negligence on the part of the doctor to permit him to walk downstairs unaccompanied but also that that negligence was the proximate cause of his fall.

Legal causal connection between the negligence and the fall may be shown by either direct or circumstantial evidence, and when a finding is a reasonable inference from the facts and conditions directly proved, it must be classed as legal evidence and not as a mere conjecture. Hodgson v. Bigelow, 335 Pa. 497, 519, 7 A.2d 338, 348–349 (1939); Schulz v. Pennsylvania Railroad Co., 1956, 350 U.S. 523, 76 S.Ct. 608.

After the fall, nurses, at least one of whom was registered, carried Brown to a bed in a nearby treatment room. There was testimony that it was malpractice to carry a person by his extremities when a spinal injury is suspected, but that a board-like stretcher should be used and the head put in traction.[15] However, no specific injury was shown to have been caused by this act of negligence.

From the records, testimony and circumstances, the jury could have found that no neurological tests were made, no spinal tap was taken, and no X-ray pictures were taken. The defendants did not call as witnesses Dr. Kelly or the doctor who consulted with him, nor take their depositions. Brown not only complained that his neck was broken but he had an abrasion on the top of his head, a cut cheek, bloody nose and paralysis of his extremities. From these facts and circumstances, the jury was fully warranted in finding that the doctor disregarded the likelihood of an injury to the spine and failed to use the approved tests to determine whether or not the patient sustained a fracture or dislocation of his vertebrae. Instead he diagnosed his condition as hysterical paralysis and treated him accordingly.

That treatment which he prescribed was completely at variance with the treatment required by the patient's true condition. He was moved about without head support. His head was never put in traction. He was permitted to move about in bed. Massage was administered. Respiratory depressants were prescribed.

During the next day or two further symptoms indicating an organic lesion

---

15. There was evidence that the doctor was present while Brown lay on the floor at the foot of the stairs (see entry in hospital records written by Dr. Kelly, Exhibit 5, progress note of September 9, 1949; T. pp. 406–7); there was also testimony that he arrived after Brown had been put to bed (T. p. 176).

rather than hysteria appeared. The patient exhibited a distended abdomen, paralysis of the legs and sometimes one or both arms, elevated temperature ranging to 104°, inability to defecate, projectile vomiting, respiratory embarrassment and continued complaints of neck pains. But, notwithstanding, it does not appear that any of the ordinary tests were ever made which would have led to a correct diagnosis and proper treatment. Brown died in the early morning of September 13th.

Post-mortem X-rays disclosed a dislocation of the fourth cervical vertebra on cervical vertebra number five, the extent being 8 mm.; also a fracture of the posterior spinous process of the fifth vertebra with 1 c.m. hiatus between the fragments with the body of this vertebra being depressed. No indication of hemorrhage in the spinal cord was found in the limited autopsy ordered by the Sanitarium.

From this evidence the jury was justified in finding that malpractice was the proximate cause of the decedent's death.

 The owners complain that the verdicts were based on speculation and conjecture. There was testimony that if the injury had been properly diagnosed and the proper treatment administered, the patient would have lived and recovered from the effects of the broken neck as well as from the neurosis. Thus, we think there was a sufficient eviden-

tiary basis to support a finding of loss of earning power; the fact that some speculation and conjecture concerning the extent of the recovery was involved does not invalidate the determination of the jury. Indeed, from the size of the verdicts one suspects that the jury did not find that malpractice caused the fall because if it had the evidence would have supported verdicts in a much larger total amount.[16]

 Loss of future earning power less cost of future maintenance is inherently subject to considerable conjecture in a death case; mathematical certainty cannot be attained and is not required. The same is true of problems pertaining to life expectancy and the division of the loss of earning power between the verdict under the Wrongful Death Act, 12 P.S. § 1601 et seq. and the verdict under the Survival Act, 20 P.S. § 320.601 et seq. Those questions are ones peculiarly adapted for resolution in the sound judgment and discretion of the jury.

Under the evidence, pain and suffering may well have been a substantial item in arriving at the verdict under the Survival Act.

 There are no indications of caprice, passion or prejudice on the part of the jury. In our opinion the verdicts are not excessive.

An appropriate order will be entered.

---

16. The decedent was 32 years of age, college educated, had an excellent position with an established steel company. He left a widow and 3 children. His salary was $665 per month and would have increased gradually to $925 per month at time of trial. Based on an ex-

pectancy of 36 years, gross earnings of around $370,000 could have been calculated. After deduction of the cost of future maintenance and reduction of the balance of estimated future earnings to present worth, verdicts well in excess of $60,000 could have been expected.